**E-FILED**
Thursday, 27 March, 2008  10:49:53 AM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

MICHAEL D. MCCOY,

      Plaintiff,

    vs.

HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY and HARTFORD
LIFE INSURANCE COMPANY,

      Defendants.

No. 08-

## COMPLAINT

### (ERISA - Recovery of Benefits)

Plaintiff, MICHAEL D. MCCOY, by his attorney, Glenn A. Stanko of Rawles, O'Byrne, Stanko, Kepley & Jefferson, P.C., for his complaint against defendants, HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY and HARTFORD LIFE INSURANCE COMPANY, alleges and states as follows:

### JURISDICTION AND VENUE

1.     This is an action brought under §502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended (29 U.S.C. §1132(a)(1)(B)).

2.     Jurisdiction of this court is invoked pursuant to 28 U.S.C. §1331, 29 U.S.C. §1132(e)(1), and 29 U.S.C. §1132(f), because this is an action arising under the laws of the United States and, more specifically, an action arising under §502 of ERISA (29 U.S.C. §1132).

3.     Venue lies in the Central District of Illinois pursuant to 29 U.S.C. §1132(e)(2) in that the alleged breach of the employee welfare benefit plan at issue took place in the Central District of Illinois, the defendants reside in the Central District of Illinois, and the defendants may be found in the Central District of Illinois.

4.    Plaintiff's claim arises from Champaign County, Illinois, because of the following:

(a)    Plaintiff resides in Champaign County, Illinois;

(b)    Plaintiff's rights under the employee welfare benefit plan at issue arise out of his prior employment with Insurance Risk Managers, Ltd., in Champaign County, Illinois;

(c)    The employee welfare benefit plan at issue was established and maintained by Insurance Risk Managers, Ltd., in Champaign County, Illinois;

(d)    Plaintiff received disability payments under the employee welfare benefit plan at issue in Champaign County, Illinois, from May 1994 through June 2007.

<u>PARTIES AND THEIR INTERESTS</u>

5.    Plaintiff, Michael D. McCoy, was born in 1947, is presently 60 years old, and is a resident of Tolono, Illinois.

6.    Prior to February 5, 1994, plaintiff was employed as an insurance producer by Insurance Risk Managers, Ltd.

7.    Prior to the termination of his long term disability benefits as alleged below, plaintiff was insured under a group long term disability policy ("LTD policy") issued by Continental Casualty Company on June 1, 1993, as policy number SR-83025950.  A copy of the LTD policy, together with subsequent riders, is attached hereto as Exhibit A.

8.    All active, full-time employees of Insurance Risk Managers, Ltd., were covered by the LTD policy, all premium payments were paid entirely by Insurance Risk Managers, Ltd., and participation was not voluntary for the employees of Insurance Risk Managers, Ltd.

9.    The LTD policy issued by Continental Casualty Company represents an "employee welfare benefit plan" under 29 U.S.C. §1002(1).

2

10. Prior to the termination of his long term disability benefits as alleged below, plaintiff was a "participant" in the employee welfare benefit plan under 29 U.S.C. §1002(7).

11. Apart from the LTD policy, there is no identifiable plan or plan name, and the employee welfare benefit plan consists of nothing more than the LTD policy itself.

12. Defendant, Hartford Life and Accident Insurance Company ("HLAIC"), is a foreign insurer authorized to do business and doing business in the State of Illinois.

13. Defendant, Hartford Life Insurance Company ("HLIC"), is a foreign insurer authorized to do business and doing business in the State of Illinois.

14. HLAIC and HLIC are subsidiaries of The Hartford Financial Services Group, Inc., which is also referred to as "The Hartford."

15. On or about January 1, 2004, The Hartford acquired various group benefit products from CNA, which included the LTD policy issued by Continental Casualty Company to Insurance Risk Managers, Ltd., as described above.

16. Subsequent to The Hartford's acquisition of the LTD policy, HLAIC has administered the policy (as shown by Exhibit B hereto), and HLAIC is the "administrator" (29 U.S.C. §1002(16)(A)) of the employee welfare benefit plan represented by the LTD policy.

17. Prior to the termination of plaintiff's long term disability benefits as alleged below, HLIC was paying plaintiff's disability benefits under the LTD policy, as shown by Exhibit C hereto.

<u>STATEMENT OF CLAIM</u>

18. Plaintiff became totally disabled on or about February 5, 1994.

19. The LTD policy was in force and effect when plaintiff became disabled.

3

20.     After a 90 day elimination period, plaintiff began receiving benefits under the LTD policy beginning on or about May 7, 1994.

21.     Plaintiff continuously received disability benefits under the LTD policy from on or about May 7, 1994, through June 30, 2007.

22.     By letter dated June 29, 2007 (Exhibit D hereto), HLAIC informed plaintiff that his long term disability benefits under the LTD policy were being terminated as of the date of the letter because he no longer satisfied the definition of "disability" under the policy.

23.     The applicable definition of "Total Disability" under the LTD policy is as follows:

"Total Disability" means that, because of Injury of Sickness, the Insured Employee is:

(1)  continuously unable to engage in any occupation for which he is or becomes qualified by education, training, or experience; and

(2)  under the regular care of a licensed physician other than himself.

24.     In terminating plaintiff's disability benefits under the LTD policy, HLAIC asserted that plaintiff had become capable of engaging in sedentary employment notwithstanding the fact that he had not worked for over 13 years at the time of termination, had been awarded social security benefits as of February 5, 1994, was still receiving social security disability benefits as of June 29, 2007, had continuously received benefits under the LTD policy since they first began in May 1994, and had not been the recipient of any further education or training since becoming disabled.

25.     HLIC paid plaintiff's disability benefits under the LTD policy through June 2007, but made no further payments thereafter.

26.     At the time his disability benefits were terminated, plaintiff was receiving a net benefit of $3,375.06 per month after HLIC took an offset for the social security disability benefits received by plaintiff.

4

27.     By letter dated December 6, 2007 (Exhibit E hereto), plaintiff submitted a timely appeal to HLAIC regarding the termination of his disability benefits under the LTD policy.

28.     By letter dated February 4, 2008 (Exhibit F hereto), and with the agreement of HLAIC, plaintiff submitted additional information relating to his appeal.

29.     By letter dated March 18, 2008 (Exhibit G hereto), HLAIC upheld the termination of plaintiff's long term disability benefits.

30.     Plaintiff has continued to be totally disabled within the applicable definition of the LTD policy on and subsequent to the termination of his benefits by HLAIC and the cessation of payments by HLIC, and HLAIC and HLIC have breached the LTD policy and wrongfully denied plaintiff his disability benefits.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, plaintiff, MICHAEL D. MCCOY, prays as follows:

I.      That the court review and set aside the decision of Hartford Life and Accident Insurance Company terminating plaintiff's disability benefits under the group long term disability policy as of June 29, 2007.

II.     That the court find that plaintiff was totally disabled under the provisions of the group long term disability policy at the time his disability benefits were terminated.

III.    That the court find that plaintiff is entitled to a continuation of his disability benefits subsequent to June 29, 2007.

IV.     That the court order Hartford Life Insurance Company to pay plaintiff the disability benefits which should have been paid to him subsequent to June 29, 2007.

V.      That the court order Hartford Life Insurance Company to pay plaintiff the proper amount of disability benefits in the future.

VI.　　That the court order defendants to pay the reasonable attorney's fees and costs of plaintiff pursuant to 29 U.S.C. §1132(g).

VII.　　That the court order such other relief as the court deems just and appropriate.

MICHAEL D. MCCOY, Plaintiff

By:　Rawles, O'Byrne, Stanko, Kepley & Jefferson, P.C.
　　　His Attorneys

By:　　s/ Glenn A. Stanko
　　　Glenn A. Stanko (Bar Number: 2703122)
　　　Attorney for Plaintiff
　　　Rawles, O'Byrne, Stanko & Kepley, P.C.
　　　501 West Church Street
　　　P.O. Box 800
　　　Champaign, IL　61824-0800
　　　Telephone:　217-352-7661
　　　Facsimile:　217-352-2169
　　　E-mail:　gastanko@rosklaw.com

JS44
(Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Michael D. McCoy

## DEFENDANTS

Hartford Life and Accident Insurance Company
Hartford Life Insurance Company

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF

Champaign, Illinois

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Glenn A. Stanko
RAWLES, O'BYRNE, STANKO, KEPLEY & JEFFERSON P.C.
501 West Church Street, P.O. Box 800
Champaign, Illinois, 61824 -0800
(217) 352-7661, fax: (217) 352-2169

ATTORNEYS (IF KNOWN)

Not Known

## II. BASIS OF JURISDICTION

☐ 1 U. S. Government Plaintiff

☐ 2 U.S. Government Defendant

☒ 3 Federal Question

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of This State | ☐ | ☐ | Incorporated or Principal Place of Bus. in this State | ☐ | ☐ |
| Citizen of Another State | ☐ | ☐ | Incorporated and Principal Place of Bus. in Another State | ☐ | ☐ |
| Citizen or Subject of a Foreign Country | ☐ | ☐ | Foreign Nation | ☐ | ☐ |

## IV. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | ☐ 310 Airplane | ☐ 362 Personal Injury – Med. Malpractice | ☐ 610 Agriculture | ☐ 422 Appeal 28 U.S.C. 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury – Product Liability | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 U.S.C. 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 625 Drug Related Seizure of Property 21 U.S.C. 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 330 Federal Employers' Liability | | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment and Enf. of Judgment | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recover of Defaulted Student Loans (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veterans Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 U.S.C. 3410 |
| ☐ 190 Other Contract | | | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | **CIVIL RIGHTS** | **PRISONER PETITION** | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | ☐ 441 Voting | ☐ 510 Motions To Vacate Sentence | ☐ 730 Labor/Mgmt Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 442 Employment | **HABEAS CORPUS:** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 443 Housing/ Accommodations | ☐ 530 General | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☒ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS – Third Party 26 U.S.C. 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | | ☐ 550 Civil Rights | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 555 Prison Condition | | | |

## VI. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remand from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Trans'd from another District

☐ 6 Multidistrict Litigation

Appeal to District Judge from
☐ 7 Magistrate Judgment

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

ERISA claim for recovery of benefits under 29 U.S.C. §1132(a)(1)(B)

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23

DEMAND $(unspecified)

CHECK YES only if demanded in complaint
JURY DEMAND: ☐ Yes ☒ No

## VIII. RELATED CASE(S) (See Instructions):
IF ANY

Judge: _____ Docket Number: _____

DATE
MARCH 27, 2008

SIGNATURE OF ATTORNEY OF RECORD
S/ GLENN A. STANKO

FOR OFFICE USE ONLY

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

MICHAEL D. MCCOY,

         Plaintiff,

    vs.                            No. 08-

HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY and HARTFORD
LIFE INSURANCE COMPANY,

         Defendants.

## INDEX OF EXHIBITS TO COMPLAINT

Continental Casualty Company group long term disability policy ..........................Exhibit A

Letter to Glenn A. Stanko from Marsha L. Macko of Hartford Life and Accident
Insurance Company dated February 8, 2008 .........................................................Exhibit B

2007 W-2 issued by Hartford Life Insurance Company to Michael McCoy ............Exhibit C

Letter to Michael D. McCoy from Jorge L. Pagan of The Hartford dated
June 29, 2007, terminating Michael D. McCoy's long term disability benefits........Exhibit D

Letter to The Hartford Claim Appeals Unit from Glenn A. Stanko dated
December 6, 2007, appealing the termination of Michael D. McCoy's long term
disability benefits.................................................................................................Exhibit E

Letter to Marsha L. Macko from Glenn A. Stanko dated February 4, 2008,
forwarding additional documentation..................................................................Exhibit F

Letter to Glenn A. Stanko from Marsha L. Macko dated March 18, 2008,
denying Michael D. McCoy's appeal of the termination of his long term
disability benefits.................................................................................................Exhibit G

    Personal identifiers have been redacted from the above exhibits pursuant to Rule 5.2 of the
Federal Rules of Civil Procedure and pursuant to the policy of the United States District Court
for the Central District of Illinois relating to electronically filed pleadings.

E-FILED
Thursday, 27 March, 2008 ___ AM
Clerk, U.S. District Court, ILCD



# Continental Casualty Company

CNA Plaza            A Stock Company
Chicago, Illinois 60685

Policy No.:   SR-83025950

Application is hereby made to the Continental Casualty Company for a policy of group insurance based on the following statements· and representations:

1. Employer:
   **INSURANCE RISK MANAGERS, LTD.**

   Address:  **1803 WOODFIELD DR.**
   City:  **SAVOY**                        State:  **IL**        Zip Code:  **61874**

   Nature of Business:
   **INSURANCE AGENCY**

2. What period of time must elapse before an employee is eligible for this coverage?

   Present Employees:      **0 days**        New Employees:   **30 days**

   The following group or groups of employees are eligible:

   | DESCRIPTION OF ELIGIBLE EMPLOYEES |
   |---|
   | All active, full-time* employees of the Employer.<br><br>* "Active, full-time" means an employee works at least   **30** hours per week. Part-time, temporary or seasonal employees are not eligible. |

3. Total Number of Employees on Payroll:      **77**        Total Number Eligible:        **77**
4. Insured Employee Occupation Period:
   **36 months**
5. Premium is calculated by:  See Addendum 1.
6. Premium is payable in the following manner:  See Addendum 1.
7. What percent of the premium is to be paid by the Employer?     **100** %
8. This policy shall be made effective at 12:01 A.M., Standard Time at the above address of the Employer on **June 1, 1993**       .

   The insurance of Employees who become eligible after the effective date of this policy shall become effective on: the first day of the month that falls on or next follows the date the Employee becomes eligible for the coverage.

**EXHIBIT A**

/-C                                                              NON-CONTRIB.

ADDENDUM 1

SR-83025950

Policy Number

INSURANCE RISK MANAGERS, LTD.

June 1, 1993

Employer

Effective Date

5.  Premium is calculated by:

Multiplying the monthly salary for each Insured Employee by __.0061 . An Insured Employee's salary in excess of $ 14,167.00 per month shall not be included in the premium calculation for such Insured Employee.

6.  Premium is payable in the following manner:

The policy is issued in consideration of the payment in arrears of the monthly premium which is based on the actual wage or salary of all Insured Employees for the first and each subsequent policy month and calculated at the premium rate stated above. Such payment shall be made within 20 days after the end of each monthly premium accounting period and shall be accompanied by a premium adjustment report.

Adj

"Salary" as used in Statements 5 and 6 shall mean the monthly wage or salary paid to the Insured Employee by the Employer during the policy month including commission but excluding any overtime earnings, incentive pay, bonuses, or other compensation.

Comm

ADDENDUM 2

SR–83025950

Policy Number

INSURANCE RISK MANAGERS, LTD.

June 1, 1993

Employer

Effective Date

(1) "Salary" means the monthly wage or salary that the Insured Employee was receiving from the Employer on the date the Disability began. It excludes overtime earnings, incentive pay, bonuses or other compensation but it includes the monthly average of commissions paid to the Insured Employee by the Employer during the preceding <u>36</u> month period. If the Insured Employee has worked for the Employer for less than <u>24</u> months, salary includes 75% of the monthly average of commissions paid during the period worked.

75% Comm

(2) The Monthly Benefit under this policy shall be reduced by:

   1. Disability benefits paid, payable, or for which there is a right under:

      a. The Social Security Act, excluding any amounts for which the Insured Employee's dependents may qualify because of the Insured Employee's Disability,

      b. Any Worker's Compensation or Occupational Disease Act or Law, or any other law which provides compensation for an occupational injury or sickness, or

      c. Any State Disability Benefit Law;

   2. Disability benefits paid under:

      a. Any group insurance plan provided by or through the Employer,

      b. Any formal sick leave plan provided by the Employer, or

      c. Any Retirement Plan provided by the Employer;

   3. Retirement benefits paid under the Social Security Act, excluding any amounts for which the Insured Employee's dependents may qualify because of the Insured Employee's retirement;

   4. Retirement benefits paid under a Retirement Plan provided by the Employer except for amounts attributable to the Insured Employee's contributions.

If any benefit described above is paid in a single sum through compromise settlement or as an advance on future liability, the amount which pertains to the Insured Employee's Disability will be divided by the number of months from the date of its receipt to the end of the benefit period applicable to the Insured Employee. The result shall be deducted from the Insured Employee's Monthly Benefit.

PO

The Monthly Benefit, after the reductions stated above, if any, will not be further reduced for subsequent cost-of-living increases which are paid, payable, or for which there is a right under any other benefit described above.

"Retirement Plan" means a plan which provides retirement benefits to employees and is not funded wholly by employee contributions. It does not include: 1) a profit sharing plan, a thrift or savings plan; 2) an individual retirement account (IRA); 3) a tax sheltered annuity (TSA); 4) a stock ownership plan; or 5) a deferred compensation plan.

STD

ADDENDUM 2 (continued)

SR-83025950

Policy Number

INSURANCE RISK MANAGERS, LTD.

June 1, 1993

Employer

Effective Date

In no event will the Monthly Benefit payable for Total Disability (but not for Partial Disability and/or Rehabilitative Employment) be reduced to less than $100 or 10% of the Insured Employee's Monthly Benefit prior to the reductions stated above, whichever is greater.

ADDENDUM 3

SR-83025950
_____
Policy Number

INSURANCE RISK MANAGERS, LTD.
_____
Employer

June 1, 1993
_____
Effective Date

**MAXIMUM PERIOD PAYABLE**

| Age on Date<br>Disability Commences | |
|---|---|
| 61 years or younger | To the Insured Employee's 65th birthday |
| 62 years | 42 months |
| 63 years | 36 months |
| 64 years | 30 months |
| 65 years | 24 months |
| 66 years | 21 months |
| 67 years | 18 months |
| 68 years | 15 months |
| 69 years or older | 12 months |

(A1LG)

# Continental Casualty Company



CNA Plaza
Chicago, Illinois 60685

A Stock Company

**INSURANCE RISK MANAGERS, LTD.**

EMPLOYER

**SR-83025950**

POLICY NUMBER

**June 1, 1993**

EFFECTIVE DATE

**FORMS ATTACHED AT ISSUANCE**

| | | |
|---|---|---|
| T1-67938-A | T1-89314-A | T1-89316-A |
| T1-67949-A | T1-67950-B | T1-67948-A |
| T1-67951-A | T1-67952-B | T1-67953-A |
| T1-67954-B | T1-67955-B | T1-67956-A |
| T1-89397-A | T1-54955-B | BG-66552-B |
| Z1-67957-C | | |

We agree with the Employer to insure certain eligible employees of the Employer. We promise to pay benefits for loss covered by this policy in accordance with its provisions.

This policy is issued in consideration of the payment of premium and the statements made in the Application.

## POLICY EFFECTIVE DATE AND TERM

This policy takes effect on the Effective Date stated above. All insurance periods will be computed from that date. This policy remains in force for the period for which premium has been paid. It may be renewed for further successive periods by payment of premium as stated in this policy. We have the right to non-renew it as of the first annual anniversary date or any later premium due date. If We non-renew, We must give the Employer at least thirty-one days prior written notice of such non-renewal.

All periods of insurance begin and end at 12:01 a.m., Standard Time, at the Employer's address stated in the Application.

## ELIGIBLE EMPLOYEES

The employees eligible to be insured under this policy are described in Statement 2 of the Application.

## EMPLOYEE'S EFFECTIVE DATE OF INSURANCE

The insurance for employees who are eligible as of the Effective Date of this policy shall take effect on such date. The insurance for employees who become eligible after the Effective Date of this policy shall take effect as stated in Statement 8 of the Application.

If, because of Injury or Sickness, an eligible employee is not working full-time on the date the insurance would otherwise take effect, it will take effect on the day the employee returns to full-time work.

SIGNED FOR THE CONTINENTAL CASUALTY COMPANY

*D. H. Chookaszian*
Chairman of the Board

*D. M. Lowry*
Secretary

Countersigned by _____

Licensed Resident Agent

P1-69487-A                    (1)                    NON-CONTRIB

# DEFINITIONS

"Application" means the Employer's application attached to this policy.

"Disability" means Total Disability, Partial Disability and Rehabilitative Employment.

"Injury" means bodily injury caused by an accident which results, directly and independently of all other causes, in loss which begins while the Insured Employee's coverage is in force.

"Insured Employee" means an employee whose insurance is in force under the terms of this policy.

"Monthly Benefit", "Elimination Period", and "Maximum Period Payable" mean that benefit and those periods shown in the Schedule of Benefits which apply to the Insured Employee.

"Partial Disability" means that the Insured Employee, because of Injury or Sickness, is:

    (1)   continuously unable to perform the substantial and material duties of his regular occupation;

    (2)   under the regular care of a licensed physician other than himself; and

    (3)   gainfully employed in his regular occupation on a partial and/or part-time basis.

"Rehabilitative Employment" means that the Insured Employee, because of Injury or Sickness, is:

    (1)   continuously unable to perform the substantial and material duties of his regular occupation on a full-time, part-time or partial basis;

    (2)   under the regular care of a licensed physician other than himself; and

    (3)   gainfully employed in any occupation, other than his regular occupation, on a full-time or part-time basis for which he is or becomes qualified by education, training or experience.

"Salary" means as defined in the Schedule of Benefits.

"Schedule of Benefits" means Statement 9 of the Application for this policy.

"Sickness" means sickness or disease causing loss which begins while the Insured Employee's coverage is in force.

"Total Disability" means that, during the Elimination Period and the Insured Employee Occupation Period shown in Statement 4 of the Application, the Insured Employee, because of Injury or Sickness, is:

    (1)   continuously unable to perform the substantial and material duties of his regular occupation;

    (2)   under the regular care of a licensed physician other than himself; and

    (3)   not gainfully employed in any occupation for which he is or becomes qualified by education, training or experience.

After the Monthly Benefit has been payable for the Insured Employee Occupation Period shown in Statement 4 of the Application, "Total Disability" means that, because of Injury or Sickness, the Insured Employee is:

    (1)   continuously unable to engage in any occupation for which he is or becomes qualified by education, training or experience; and

    (2)   under the regular care of a licensed physician other than himself.

"We", "Our" and "Us" mean the Continental Casualty Company, Chicago, Illinois.

# DISABILITY BENEFITS

**TOTAL DISABILITY BENEFIT.** We will pay the Monthly Benefit for each month of Total Disability which continues after the Elimination Period. The Monthly Benefit will not be payable during the Elimination Period nor beyond the Maximum Period Payable.

**PARTIAL DISABILITY BENEFIT.** We will pay a Partial Disability Benefit for each month of Partial Disability which follows: (1) the Elimination Period; or (2) a period for which Total Disability or Rehabilitative Employment Benefits were payable. The amount payable will be equal to the Monthly Benefit less a portion of the Insured Employee's monthly earnings during Partial Disability. The portion which will be deducted is the Partial Disability Reduction shown in the Schedule of Benefits.

Partial Disability Benefits will cease on the earliest of the following: (1) the date the Insured Employee's earnings from such employment equals or exceeds 100% of his pre-Disability Salary; (2) after 24 months; or (3) the Maximum Period Payable.

**REHABILITATIVE EMPLOYMENT BENEFIT.** We will pay a Rehabilitative Employment Benefit for each month of Rehabilitative Employment which follows: (1) the Elimination Period; or (2) a period for which Total Disability or Partial Disability Benefits were payable.

(1)   The amount payable during the first 12 months of Rehabilitative Employment Benefit payments will be equal to the Monthly Benefit less any amount of the Insured Employee's earnings from such employment that exceeds 100% of the Insured Employee's pre-Disability Salary.

(2)   The amount payable after the first 12 months of Rehabilitative Employment Benefit payments will be equal to the Monthly Benefit less a portion of the Insured Employee's earnings from such employment. The portion which will be deducted is the Rehabilitative Employment Reduction shown in the Schedule of Benefits.

Rehabilitative Employment Benefits will cease on the earliest of the following: (1) after the first 12 months of Rehabilitative Benefit payments, the date the Insured Employee's earnings from such Rehabilitative Employment equals or exceeds 100% of the Insured Employee's pre-Disability Salary; (2) after 24 months; or (3) the Maximum Period Payable.

**GENERAL.** Total benefits payable for Total Disability, Partial Disability and Rehabilitative Employment shall not exceed the Maximum Period Payable.

If a benefit is payable for a period less than 1 month, it will be paid on the basis of 1/30th of the Monthly Benefit for each day of Disability.

# EXTENSION OF MAXIMUM PERIOD PAYABLE

The Maximum Period Payable will extend beyond the age at which the Monthly Benefit otherwise ceases if the disabled employee reaches that age but has not received 12 Monthly Benefit payments during the current period of Disability. In that event, the Maximum Period Payable shall be extended during the continuance of the Disability until a total of 12 monthly payments have been made.

T1-67949-A

# RECURRENT DISABILITY

If Disability for which benefits were payable ends but recurs due to the same or related causes less than 6 months after the end of a prior Disability, it will be considered a resumption of the prior Disability. Such recurrent Disability shall be subject to the provisions of this policy that were in effect at the time the prior Disability began.

Disability which recurs more than 6 months after the end of a prior Disability shall be subject to: 1) a new Elimination Period; 2) a new Maximum Period Payable; and 3) the other provisions of this policy that are in effect on the date the Disability recurs.

Disability must recur while the Insured Employee's coverage is in force under this policy.

T1-67950-B

# EXCLUSIONS AND LIMITATIONS

This policy does not cover any loss caused by or resulting from declared or undeclared war or an act of either.

T1-67948-A

Inv. No. B1-89394-A

## EXTENSION OF MAXIMUM PERIOD PAYABLE

The Maximum Period Payable will extend beyond the age at which the Monthly Benefit otherwise ceases if the disabled employee reaches that age but has not received 12 Monthly Benefit payments during the current period of Disability. In that event, the Maximum Period Payable shall be extended during the continuance of the Disability until a total of 12 monthly payments have been made.

T1-67949-A

## RECURRENT DISABILITY

If Disability for which benefits were payable ends but recurs due to the same or related causes less than 6 months after the end of a prior Disability, it will be considered a resumption of the prior Disability. Such recurrent Disability shall be subject to the provisions of this policy that were in effect at the time the prior Disability began.

Disability which recurs more than 6 months after the end of a prior Disability shall be subject to: 1) a new Elimination Period; 2) a new Maximum Period Payable; and 3) the other provisions of this policy that are in effect on the date the Disability recurs.

Disability must recur while the Insured Employee's coverage is in force under this policy.

T1-67950-B

## EXCLUSIONS AND LIMITATIONS

This policy does not cover any loss caused by or resulting from declared or undeclared war or an act of either.

T1-67948-A

War Only

## TERMINATION OF EMPLOYEE'S INSURANCE

The Insured Employee's coverage will terminate on the earliest of the following dates:

   (1)   the date this policy is terminated;

   (2)   the premium due date if the Employer fails to pay the required premium for the Insured Employee, except for an inadvertent error; or

   (3)   the date the Insured Employee

      (a)   is no longer a member of a class eligible for this insurance,

      (b)   withdraws from the program,

      (c)   is retired or pensioned, or

      (d)   ceases work because of a leave of absence, furlough, layoff or temporary work stoppage due to a labor dispute, unless We and the Employer have agreed in writing to continue insurance during such period.

Termination will not affect a covered loss which began before the date of termination.

T1-67951-A

## PREMIUM

Premium for this policy is computed as stated in Statement 5 of the Application. It shall be paid by the Employer as stated in Statement 6 of the Application. Payment is to be made to Us or Our Agent. The premium rate may be changed at the end of the first insurance year or any later premium due date.

## WAIVER OF PREMIUM

We will waive premium for an Insured Employee during the period of Disability for which the Monthly Benefit is payable under this policy. During this period, the Insured Employee's insurance will remain in force. This provision is subject to the Termination of Employee's Insurance provision, except for payment of premium.

T1-67952-B

## CERTIFICATES

We will deliver certificates of insurance to the Employer for issuance to each Insured Employee. The certificates will describe the benefits, to whom they are payable, the policy limitations and where this policy may be inspected.

T1-67953-A

## UNIFORM PROVISIONS

**ENTIRE CONTRACT; CHANGES.** This policy, the Application, the evidence of insurability (if any) of each Insured Employee, and any attached papers are the entire contract between the parties.

Any statement made by the Employer or any Insured Employee shall, in the absence of fraud, be a representation and not a warranty. No such statement shall void the insurance, reduce the benefits or be used in defense to a claim unless it is in writing and a copy furnished to the Employer or Insured Employee, whoever made the statement. No statement of the Employer will be used to void this policy after it has been in force for two years. No statement of any Insured Employee will be used in defense to a claim for loss incurred or disability which begins after the employee has been insured for 2 years.

No change in this policy is valid unless approved in writing on this policy by one of Our officers. No agent has the right to change this policy or to waive any of its provisions.

**GRACE PERIOD.** A grace period of 31 days is allowed for the payment of each premium due after the first premium. This policy will remain in force during the grace period.

A grace period will not apply if We have sent written notice to the Employer of Our intent not to renew this policy at least 31 days before the premium due date. Such notice will be sent to the Employer's last address as shown in Our records.

If the Employer gives Us written notice of his intent not to renew this policy, the grace period will not apply. This policy will terminate on the date stated on the notice or on the date We receive such notice, whichever is later. The Employer will be liable for all premiums due for the period this policy remains in force including the grace period, if it applies.

## UNIFORM PROVISIONS

**ENTIRE CONTRACT; CHANGES.** This policy, the Application, the evidence of insurability (if any) of each Insured Employee, and any attached papers are the entire contract between the parties.

Any statement made by the Employer or any Insured Employee shall, in the absence of fraud, be a representation and not a warranty. No such statement shall void the insurance, reduce the benefits or be used in defense to a claim unless it is in writing and a copy furnished to the Employer or Insured Employee, whoever made the statement. No statement of the Employer will be used to void this policy after it has been in force for two years. No statement of any Insured Employee will be used in defense to a claim for loss incurred or disability which begins after the employee has been insured for 2 years.

No change in this policy is valid unless approved in writing on this policy by one of Our officers. No agent has the right to change this policy or to waive any of its provisions.

**GRACE PERIOD.** A grace period of 31 days is allowed for the payment of each premium due after the first premium. This policy will remain in force during the grace period.

A grace period will not apply if We have sent written notice to the Employer of Our intent not to renew this policy at least 31 days before the premium due date. Such notice will be sent to the Employer's last address as shown in Our records.

If the Employer gives Us written notice of his intent not to renew this policy, the grace period will not apply. This policy will terminate on the date stated on the notice or on the date We receive such notice, whichever is later. The Employer will be liable for all premiums due for the period this policy remains in force including the grace period, if it applies.

**NOTICE OF CLAIM.** Written notice of claim must be given to Us within 30 days after the loss begins or as soon as reasonably possible.

The notice will suffice if it identifies the Insured Employee and this policy. It must be sent to Us at Our Home Office, CNA Plaza, Chicago, Illinois 60685 or given to Our agent.

**CLAIM FORMS.** After We receive the written notice of claim, We will furnish claim forms within 15 days. If We do not, the claimant will be considered to have met the requirements for written proof of loss if We receive written proof which describes the occurrence, extent and nature of the loss.

**WRITTEN PROOF OF LOSS.** Written proof of loss must be furnished to Us within 90 days after the end of a period for which We are liable. If it is not possible to give the proof within 90 days, the claim is not affected if the proof is given as soon as reasonably possible. Unless the Insured Employee is legally incapacitated, written proof must be given within 1 year of the time it is otherwise due.

**TIME OF PAYMENT OF CLAIM.** Benefits will be paid monthly immediately after We receive due written proof of loss.

**PAYMENT OF CLAIM.** All Disability benefits are paid to the Insured Employee. Any accrued Disability or Survivor Income benefits unpaid at the Insured Employee's death will be paid to the named beneficiary, if any.

If there is no surviving beneficiary, payment may be made, at Our option, to the surviving person or persons in the first of the following classes of successive preference beneficiaries: the Insured Employee's (a) spouse; (b) children including legally adopted children; (c) parents; or (d) estate.

If any benefit is payable to an estate, a minor or a person not competent to give a valid release, We may pay up to $1,000 to any relative or beneficiary of the Insured Employee whom We deem to be entitled to this amount. We will be discharged to the extent of such payment made by Us in good faith.

**PHYSICAL EXAMINATION.** At Our expense, We have the right to have a physician examine the Insured Employee as often as reasonably necessary while the claim is pending.

**LEGAL ACTIONS.** No action at law or in equity can be brought until after 60 days following the date written proof of loss was given. No action can be brought after 3 years (Kansas 5 years, South Carolina 6 years) from the date written proof is required.

**CONFORMITY WITH STATE STATUTES.** If any provision of this policy conflicts with the statutes of the state in which this policy was delivered or issued, it is automatically changed to meet the minimum requirements of the statute.

## GENERAL PROVISIONS

We have the right to inspect all of the Employer's records on this policy at any reasonable time. This right will extend until: (1) 2 years after termination of this policy; or (2) all claims under this policy have been settled, whichever is later.

This policy is not in lieu of and does not affect any requirements for coverage by Workers' Compensation Insurance.

## SURVIVOR INCOME BENEFIT

If an Insured Employee dies after having received the benefit provided by this policy for at least 12 successive months and during a period for which benefits are payable, We will pay a Survivor Income Benefit. This benefit is equal to the amount the Insured Employee was last entitled to receive for the month preceding his death.

The Survivor Income Benefit shall be payable on a monthly basis immediately after We receive written proof of the Insured Employee's death. It is payable for the period stated in Statement 9 of the Application. The benefit shall accrue from the Insured Employee's date of death.

This benefit is payable to the beneficiary, if any, named by the Insured Employee under this policy. If no such beneficiary exists, the benefit will be payable in accordance with the PAYMENT OF CLAIMS provision.

T1-67955-B

## MINIMUM BENEFIT FOR SPECIFIC LOSSES

When Injury results in any of the Specific Losses listed below within 1 year after the date of the accident, We will consider the Insured Employee to be Totally Disabled. Such Insured Employee shall be entitled to payment of the Monthly Benefit after the Elimination Period, for the length of time stated below. Payment of this Benefit will cease on the Insured Empoyee's date of death.

| Specific Loss | Months Payable |
|---|---|
| Loss of both hands | 46 months |
| Loss of both feet | 46 months |
| Loss of the entire sight of both eyes | 46 months |
| Loss of one hand and one foot | 46 months |
| Loss of one hand and the entire sight of one eye | 46 months |
| Loss of one foot and the entire sight of one eye | 46 months |
| Loss of one hand | 23 months |
| Loss of one foot | 23 months |
| Loss of the entire sight of one eye | 15 months |
| Loss of the thumb and index finger of either hand | 12 months |

After payment of this Minimum Benefit, benefits may continue subject to the other provisions of this policy. If more than one loss results from any one accident, We will pay only for that loss with the greatest number of Months Payable.

"Specific Loss" means, with respect to hand or foot, the actual, complete, and permanent severance through or above the wrist or ankle joint; with respect to eye, the irrecoverable loss of the entire sight thereof; and with respect to thumb and index finger, the actual, complete, and permanent severance through or above the metacarpophalangeal joints.

T1-67956-A

# MINIMUM BENEFIT FOR SPECIFIC LOSSES

When Injury results in any of the Specific Losses listed below within 1 year after the date of the accident, We will consider the Insured Employee to be Totally Disabled. Such Insured Employee shall be entitled to payment of the Monthly Benefit after the Elimination Period, for the length of time stated below. Payment of this Benefit will cease on the Insured Employee's date of death.

| Specific Loss | Months Payable |
|---|---|
| Loss of both hands | 46 months |
| Loss of both feet | 46 months |
| Loss of the entire sight of both eyes | 46 months |
| Loss of one hand and one foot | 46 months |
| Loss of one hand and the entire sight of one eye | 46 months |
| Loss of one foot and the entire sight of one eye | 46 months |
| Loss of one hand | 23 months |
| Loss of one foot | 23 months |
| Loss of the entire sight of one eye | 15 months |
| Loss of the thumb and index finger of either hand | 12 months |

After payment of this Minimum Benefit, benefits may continue subject to the other provisions of this policy. If more than one loss results from any one accident, We will pay only for that loss with the greatest number of Months Payable.

"Specific Loss" means, with respect to hand or foot, the actual, complete, and permanent severance through or above the wrist or ankle joint; with respect to eye, the irrecoverable loss of the entire sight thereof; and with respect to thumb and index finger, the actual, complete, and permanent severance through or above the metacarpophalangeal joints.

T1-67956-A

## CONVERSION PRIVILEGE

The right to be insured under a conversion policy of total disability insurance shall be available to any Insured Employee whose employment terminates and who:

(1) Is age 69 or younger;

(2) Has been insured under this policy for at least 1 year;

(3) Makes application for conversion coverage within 31 days after termination of employment; and

(4) Is not terminating employment to retire.

Conversion will not be available if:

(1) This policy terminates;

(2) The Insured Employee was required to pay premiums under this policy, but failed to do so;

(3) The Insured Employee no longer belongs to a class of employees eligible for coverage under this policy;

(4) The Insured Employee is Disabled under the terms of this policy; or

(5) The Insured Employee becomes insured, within 31 days after termination, under another group long term disability plan provided by or through an employer.

The conversion coverage will be issued without evidence of insurability subject to these conditions:

(1) Written application and the first premium must be sent to Us within 31 days after the termination of the Insured Employee's coverage under this policy;

(2) The conversion coverage will be at the premium rates and on the form then being made available by Us for such conversion; and

(3) The effective date will be the date that the Insured Employee's coverage under this policy ceases.

T1-54955-A

# CONVERSION PRIVILEGE

The right to be insured under a conversion policy of total disability insurance shall be available to any Insured Employee whose employment terminates and who:

(1)   Has been insured under this policy for at least 1 year;

(2)   Makes application for conversion coverage within 31 days after termination of employment; and

(3)   Is not terminating employment to retire.

Conversion will not be available if:

(1)   This policy terminates;

(2)   The Insured Employee was required to pay premiums under this policy, but failed to do so;

(3)   The Insured Employee no longer belongs to a class of employees eligible for coverage under this policy;

(4)   The Insured Employee is Disabled under the terms of this policy; or

(5)   The Insured Employee becomes insured, within 31 days after termination, under another group long term disability plan provided by or through an employer.

The conversion coverage will be issued without evidence of insurability subject to these conditions:

(1)   Written application and the first premium must be sent to Us within 31 days after the termination of the Insured Employee's coverage under this policy;

(2)   The conversion coverage will be at the premium rates and on the form then being made available by Us for such conversion; and

(3)   The effective date will be the date that the Insured Employee's coverage under this policy ceases.

T1-54955-B

# CONTINUITY OF COVERAGE

Continuity of coverage is provided as follows for all your Employees whose coverage and/or eligibility are affected by the cancellation of your prior group long-term disability insurance policy and replaced with this policy.

**EMPLOYEES ACTIVELY-AT-WORK.** Each employee insured under the prior policy on the day the Employer changed insurers will be covered by the benefits provided under this policy if such employee is:

(1)   eligible for coverage under this policy in accordance with its ELIGIBLE EMPLOYEES provision; and

(2)   actively-at-work on the Effective Date of this policy.

**EMPLOYEES NOT ACTIVELY-AT-WORK.** An employee not actively-at-work, due to Injury or Sickness, on the EFFECTIVE DATE of this policy will be covered for the benefits indicated below provided such employee:

(1)   was validly insured under the Employer's prior policy on the date of transfer; and

(2)   is a member of the ELIGIBLE EMPLOYEES under this policy.

The benefits provided will be the benefits provided by the prior policy less any benefits paid or payable under that policy.

Coverage will be provided until the earliest of the following dates:

(1)   the date the employee becomes eligible and insured under this policy as described in the ACTIVELY-AT-WORK provision above;

(2)   the date the employee's coverage ends in accordance with the termination provisions of this policy; or

(3)   the date that is the end of any benefit extension as provided under the prior carrier's policy.

**PRE-EXISTING CONDITIONS.** If a Pre-existing Condition Exclusion is included in this policy, benefits may be payable for a disability due to a pre-existing condition for eligible employees who:

(1)   were actively-at-work on the date of transfer; and

(2)   insured under this policy on its Effective Date.

The benefit payable will be the lesser of:

(1)   the full benefit payable under this policy; or

(2)   the benefit under the prior policy.

Any time applied towards satisfying the elimination or waiting periods of the same or similar provisions under the prior policy shall be credited towards this policy.

T1-89397-A

## AN IMPORTANT MESSAGE FROM CNA

We welcome you as a CNA Insured and very much want to provide the service you desire.

Should you have any questions or problems concerning your insurance policy, you may contact CNA at the address shown below:

SPECIAL RISKS DIVISION
CNA INSURANCE COMPANIES
CNA PLAZA
CHICAGO, ILLINOIS 60685

You may also advise the Illinois Department of Insurance at the following address:

ILLINOIS DEPARTMENT OF INSURANCE
CONSUMER SERVICES SECTION
SPRINGFIELD, ILLINOIS 62767

CNA Insurance is a multiple-line carrier providing its Policyholders with fine Life, Health, and Property/Casualty Coverages.

BG-66552-B

Attach this document to your Policy

# Continental Casualty Company



For All the Commitments You Make®

THIS COPY

CNA Plaza                    A Stock Company       TO BE SIGNED AND RETURNED
Chicago, Illinois 60685

## RIDER #1

In consideration of the payment of the premium for the policy to which this rider is attached it is hereby understood and agreed that the Premium rate as it appears on Addendum 1 is amended to read:

.0081

In all other respects the policy remains the same.

Accepted By: _T. O. Nrewson_____

Title: _____CHAIRMAN_____

Date: _____May 22, 1995_____

This rider takes effect on **JUNE 1, 1995, 12:01 A.M.,** Standard Time, **at the address of the Employer;** it expires concurrently with the policy to which it is attached and is subject to all the definitions, conditions and provisions of the policy not inconsistent herewith.

Attached to and made part of **Policy No. SR-83025950**ssued to **INSURANCE RISK MANAGERS, INC.** by the CONTINENTAL CASUALTY COMPANY, General Office, Chicago Illinois, but the same shall not be binding upon the Company unless countersigned by its duly authorized agent.

_D. H. Chookasyian_
Chairman of the Board

_D. M. Lowry_
Secretary

Countersigned by ___Clark A. Bu_____
Licensed Resident Agent

.8

Attach this document to your Policy

# Continental Casualty Company



CNA Plaza
Chicago, Illinois 60685

A Stock Company

### AMENDMENT RIDER #2

In consideration of the payment of the premium for the policy to which this rider is attached, it is hereby understood and agreed that the Name of the Holder as stated on the Master Application, form number Z1-67957-C item 1. is amended to include the following named Subsidiary:

Insurance Risk Managers of Missouri

In all other respects this policy shall remain the same.

This rider takes effect on **April 1, 1996** 12:01 A.M., Standard Time, at the address of the Holder; it expires concurrently with the policy to which it is attached and is subject to all the definitions, conditions and provisions of the policy not inconsistent herewith.

Attached to and made part of Policy No. **SR-83025950** issued to **Insurance Risk Managers, Ltd** by the CONTINENTAL CASUALTY COMPANY, General Office, Chicago Illinois, but the same shall not be binding upon the Company unless countersigned by its duly authorized agent.

*D. H. Chookasian*
Chairman of the Board

*D. M. Loung*
Secretary

Countersigned by _____ *Clad A B* _____
Licensed Resident Agent

SRR-15288

# Continental Casualty Company

**CNA**
For All the Commitments You Make®

CNA Plaza
Chicago, Illinois 60685

A Stock Company

## AMENDMENT RIDER #3

In consideration of the payment of the premium for the policy to which this rider is attached, it is hereby understood and agreed that the premium rate is amended to :

.0122

Accepted By _T.O.Dawson_

Thomas O. Dawson

Title _CEO and Chairman of the Board_

Date _5/31/96_

This rider takes effect on June 1, 1996, 12:01 A.M., Standard Time, at the address of the Holder ; it expires concurrently with the policy to which it is attached and is subject to all the definitions, conditions and provisions of the policy not inconsistent herewith.

Attached to and made part of Policy No. SR#83025950 issued to Insurance Risk Managers, Ltd by the CONTINENTAL CASUALTY COMPANY, General Office, Chicago Illinois, but the same shall not be binding upon the Company unless countersigned by its duly authorized agent.

D. H. Chookaszian
Chairman of the Board

D. M. Lowry
Secretary

Countersigned by _Clark A. By_

Licensed Resident Agent

SRR-15288

**E-FILED**
Thursday, 27 March, 2008, 10:51:12 AM
Clerk, U.S. District Court, ILCD



THE
HARTFORD

February 8, 2008

*Issued via Fax to 217-352-2169 and US Mail*

**Glenn A. Stanko**
**Rawles, O'Byrane, Stanko, Kepley & Jefferson PC**
**501 West Church Street, P.O. Box 800**
**Champaign, IL  61824-0800**

Policy Holder:     Insurance Risk Managers, Ltd
Claimant:          Michael D. McCoy
Insured ID:        9001449368
Policy Number:   83025950
Administered by Hartford Life and Accident Insurance Company
Underwritten by Continental Casualty Company

Dear Mr. Stanko:

This letter is to confirm receipt of your letter dated 02/04/08, with additional medical documentation, for your client Michael McCoy.  This information was received in our office on 02/08/08.

The appeal review process will now continue, including the peer physician review which was detailed in our previous correspondence dated 02/21/08.

We anticipate rendering a final decision on your clients appeal for Long Term Disability (LTD) benefits on or before 03/24/08, which is the 45th date from the date the additional medical documentation was received in our office.

If you have any questions, please feel free to contact our office at Toll Free (800) 741-4306.  Our office hours are 8:00am to 8:00pm EST, Monday through Friday.

Sincerely,

*S/ Marsha L. Macko*

Marsha L. Macko, Appeal Specialist
Hartford Life and Accident Insurance Co.

**EXHIBIT B**

**Benefit Management Services**
**Maitland Claim Office**
**P.O. Box 946710**
**Maitland, FL 32794-6710**
**Fax (407) 919-6265**

E-FILED
Thursday, 27 March, 2008 10:51:21 AM
Clerk, U.S. District Court, ILCD

**Copy B-To Be Filed With Employee's FEDERAL Tax Return.**

---

| 9 Advance EIC Payment | 10 Dependent care benefits |

| e Employee's first name and initial | Last name | Suff. | 11 Nonqualified plans | 12a See instructions for box 12 |

MICHAEL MCCOY
142254
TOLONO IL 61880-9740

| 13 Statutory employee | Retirement plan | Third-party sick pay X | 12b |
| 14 Other  TAXABLE $ 20250.36  THIRD PARTY SICK PAY | 12c  12d |

f Employee's address and ZIP code

| 15 State IL | Employer's state ID number 1004-7549 | 16 State wages, tips, etc. 20,250.36 | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |

Department of the Treasury — Internal Revenue Service

---

**Copy C for Employee's Records (see Notice to Employee on back of Copy B)**

Safe, accurate, FAST! Use — Visit the IRS website at www.irs.gov/efile.

OMB No. 1545-0008

| b Employer identification number 06-0974148 | a Employee's social security number -6899 |

c Employer's name, address, and ZIP code    00020

HARTFORD LIFE INSURANCE COMPANY
P.O. BOX 946795
MAITLAND, FL 32751
(800) 303-9744

**W-2 Wage and Tax Statement**
**2007**

| 1 Wages, tips, other comp 20,250.36 | 2 Federal income tax withheld |
| 3 Social security wages | 4 Social security tax withheld |
| 5 Medicare wages and tips | 6 Medicare tax withheld |

d Control number

| 9 Advance EIC Payment | 10 Dependent care benefits |

e Employee's first name and initial    Last name    Suff.

| 11 Nonqualified plans | 12a See instructions for box 12 |

MICHAEL MCCOY
142254
TOLONO IL 61880-9740

| 13 Statutory employee | Retirement plan | Third-party sick pay X | 12b |
| 14 Other  TAXABLE $ 20250.36  THIRD PARTY SICK PAY | 12c  12d |

f Employee's address and ZIP code

| 15 State IL | Employer's state ID number 1004-7549 | 16 State wages, tips, etc. 20,250.36 | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |

Department of the Treasury — Internal Revenue Service

---

Safe, accurate, FAST! Use — Visit the IRS website at www.irs.gov/efile.

OMB No. 1545-0008

| b Employer identification number 06-0974148 | a Employee's social security number -6899 |

c Employer's name, address, and ZIP code    00020

HARTFORD LIFE INSURANCE COMPANY
P.O. BOX 946795
MAITLAND, FL 32751
(800) 303-9744

**W-2 Wage and Tax Statement**
**2007**

| 1 Wages, tips, other comp 20,250.36 | 2 Federal income tax withheld |
| 3 Social security wages | 4 Social security tax withheld |
| 5 Medicare wages and tips | 6 Medicare tax withheld |

d Control number

| 9 Advance EIC Payment | 10 Dependent care benefits |

e Employee's first name and initial    Last name    Suff.

| 11 Nonqualified plans | 12a See instructions for box 12 |

MICHAEL MCCOY
142254
TOLONO IL 61880-9740

| 13 Statutory employee | Retirement plan | Third-party sick pay X | 12b |
| 14 Other  TAXABLE $ 20250.36  THIRD PARTY SICK PAY | 12c  12d |

f Employee's address and ZIP code

| 15 State IL | Employer's state ID number 1004-7549 | 16 State wages, tips, etc. 20,250.36 | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |

**Copy 2 to Be Filed With Employee's State, City or Local Income Tax Return**

Department of the Treasury — Internal Revenue Service

---

Safe, accurate, FAST! Use — Visit the IRS website at www.irs.gov/efile.

OMB No. 1545-0008

| b Employer identification number 06-0974148 | a Employee's social security number 6899 |

c Employer's name, address, and ZIP code    00020

HARTFORD LIFE INSURANCE COMPANY
P.O. BOX 946795
MAITLAND, FL 32751
(800) 303-9744

**W-2 Wage and Tax Statement**
**2007**

**EXHIBIT C**

| 1 Wages, tips, other comp 20,250.36 | 2 Federal income tax withheld |
| 3 Social security wages | 4 Social security tax withheld |
| 5 Medicare wages and tips | 6 Medicare tax withheld |

d Control number

| 9 Advance EIC Payment | 10 Dependent care benefits |

e Employee's first name and initial    Last name    Suff.

| 11 Nonqualified plans | 12a See instructions for box 12 |

E-FILED
Thursday, 27 March, 2008  10:51:33 AM
Clerk, U.S. District Court, ILCD

THE
HARTFORD

June 29, 2007

Michael D. McCoy

Tolono, IL  61880

| | |
|---|---|
| Policy Holder: | Insurance Risk Managers, Ltd |
| Claimant: | Michael D. Mccoy |
| Policy Number: | 83025950 |
| Administered by: | The Hartford |
| Underwritten by: | Continental Casualty Company |

Dear Mr. Mccoy:

This letter is to inform you of the determination made on your claim for Long-Term Disability (LTD) benefits under the group insurance policy number 83025950 for Insurance Risk Managers, Ltd.

After review of the information gathered in the course of our investigation; we have determined that you no longer satisfy the definition of disability as stated in the policy. Therefore, benefits on your claim are hereby terminated as of the date of this communication and are no longer payable.

Please note the following policy provisions as noted on page 3 of the policy and explanation of our decision.

"Total Disability" means that, during the Elimination Period and the Insured Employee Occupation Period shown in statement 4 of the Application, the Insured Employee, because of Injury or Sickness, is:

    (1) continuously unable to perform the substantial and material duties of his regular occupation;

    (2) under the regular care of a licensed physician other than himself; and

    (3) not gainfully employed in any occupation for which he is or becomes qualified by education, training or experience.

After the Monthly Benefit has been payable for the Insured Employee Occupation Period show in Statement 4 of the Application, "Total Disability" means that, because of Injury or Sickness, the Insured Employee is:

    (1) continuously unable to engage in any occupation for which he is or becomes qualified by education, training or experience; and

    (2) under the regular care of a licensed physician other than himself.

The Insured Employee Occupation Period established in Statement 4 of the Application is 36 months. This means that in order to be considered disabled under the policy provisions, after benefits have been paid for 36 months, you would have to be considered continuously unable to engage in any occupation for which you are or become qualified by 05/05/97. After this date, in order to be considered disabled, you would have to satisfy the above stipulations. **EXHIBIT D**

Benefit Management Services
Maitland Claim Office
P.O. Box 946710
Maitland, FL 32794-6710
Fax (407) 919-6329

The information contained in your file shows that you filed a claim with a disability date of 02/05/94 due to various medical issues including cardiovascular-related conditions, and behavioral health issues and have remained off work since.

Our determination was made after review of all the information contained in your claim file. In particular the following documents were utilized in finalizing our decision. All the documentation contained in your file was viewed as a whole. This included:

- Disability Claim Form dated 04/03/05
- Claimant Questionnaire dated 05/01/06
- Physical Capacities Evaluation Form and Attending Physician's Statement Form completed by Dr. Swearingen
- Public Database Reports
- Surveillance video footage and report for activities check conducted from 09/18/06 through 09/20/06
- In-person interview, which took place on 10/25/06
- Medical Records from Dr. Sipich, Dr. Swearingen, Dr. Park and Dr. Whisenand
- Functionality Inquiry forwarded to Dr. Swearingen
- Independent Medical Review Report completed by Dr. Gregg Marella and Dr. Charles Clark from Reliable Review Services
- Employability Analysis dated 06/19/07, completed by Hartford Vocational Representative.

You reported in a Disability Claim form dated 04/03/05, that your condition was worse and that you do not perform any household duties. In a Claimant Questionnaire dated 05/01/06, you indicated that you are like an 82-year-old and that within the past year, any time you exert yourself within 15 minutes you become tired. You reported that you cannot lift over 9 pounds. You described that your typical day consists of getting up, sitting on the side of the bed for 20 minutes, and then trying to do anything to help your condition not become worse. You advised that you require equipment or adaptive devices to feed yourself. You reported that you no longer engage in hobbies or social activities and have performed no work since the date of disability.

Dr. Swearingen completed an Attending Physician's Statement on 05/03/06, in which he did not specify any physical restrictions or limitations. In an undated Physical Capacities Evaluation Form it was indicated that you become short of breath with activity, can not lift over 9 pounds, can never climb or reach above shoulder.

Various public record database reports (Lexis Nexis, Choicepoint), reflect that you have ownership of watercraft and have obtained fishing licenses.

In order to have a better understanding of your functional abilities an activities check utilizing video surveillance was conducted from 09/18/06 through 09/20/06. During this period of time you were observed entering, exiting and operating a motor vehicle to various locations; performing activities such as standing, walking, lifting/carrying items of varying shapes, sizes and weights onto a trailer; pushing items such as riding lawn mower up a ramp and onto a trailer and a push mower to mow a

lawn. You were seen operating a riding lawnmower as well to perform lawn mowing duties. You were observed performing lawn mowing duties at two different locations. You were seen arriving at restaurant establishments by yourself and remaining inside for a period of over an hour. You were reported and observed independently operating a motor vehicle while towing a landscape trailer and enter and exiting without difficulty. You demonstrated the ability to bend at the waist on multiple occasions to 90 degrees and greater rising to an upright position in a swift fluid motion. You were observed to have full range of motion to the upper and lower extremities, walking with a normal gait and steady balance on a variety of surfaces including up and down the trailer ramp. You were observed loading a push mower and riding mower onto a trailer after removing the trailer gate and carrying with one hand (right) a gas powered weed eater. You were seen carrying, grasping, handling gas containers, a small cooler, coffee cup, keys and several unidentified items. You utilized both hands/arms in operating the lawn equipment and controls on that machinery, pushing, pulling at times with just one hand. During this period of observations your were also observed going to various public establishments such as restaurants and interacting with other people.

In an attempt to allow you a good faith opportunity to resolve the discrepancies in your demonstrated activities as documented by surveillance, we requested that you attend an in-person interview with one of our investigators, which took place on 10/25/06. During this interview you reported that you are currently prevented from returning to work due to Coronary Arterosclerosis and Fibromyalgia. You advised that you suffer from depression and anxiety and that you have something called flashpoint anger and become very upset. You indicated that you are prevented from returning to any occupation because you do not have the physical capacity to work full-time. You get really irritated about things and you feel that you have to yell at people for simple things. There are no accommodations that can be made which would allow you to return to work and you are not able to do any kind of work. You reported limitations in walking, standing, lifting/carrying (up to 15 pounds), squatting, kneeling, sitting (15 to 20 minutes), being incapable of bending, being incapable of twisting at the waist, having balance and concentration problems, driving only up to 20 minutes. You indicated that you had not been able to exceed the described level of function during the past six months.

You described that the most activity that you could do in a day would be to attend an auction. You reported that you go fishing three times a year. You indicated that the only thing that you enjoy doing is mowing and having made small wood items in your wood working shop. Upon being presented with the video footage, you indicated that these activities represented a normal level of functionality for you and within my restrictions and limitations as long as you take medication. You were questioned about an entry in your medical records, which referenced an injury to the foot after using a chain saw. You described that you were assisting a friend cutting a branch.

During your interview you described functional limitations that are in contrast with the observations made during the activities checks. At the same time you verbalized being functional and being capable of performing activities as observed.

Dr. Family Practice noted on 07/26/06 complaints of knot on right leg present for several weeks. The examination revealed no tenderness, inflammation or swelling. No further recommendations were made and you were told that it appeared to be resolving on its own. It was noted that you

requested that disability forms to be completed, you were recommended to complete a work capacity evaluation through Occupational Medicine which you declined.

An office visit note dated 06/10/05 dictated by Dr. Soo Park, cardiologist was included with the records rec'd from Dr. Whisenand. You were noted to be status post CABG and multiple stenting to vein graft approx 2 to 3 years prior. It was noted that there was no recurrence of unstable angina and follow up stress echo was within normal limits. It was indicated that you complained of chronic chest and back pain which were not interfering with your ability to perform daily living activities. The impression was that you were doing well on a cardiac standpoint with no new cardiac issues to deal with.

The records from Dr. Whisenand through 12/27/06, show that you are reported to have goal directed speech with rapid fluent responses. You mood was described as dysthymic. He noted that you have suicidal ideations from time to time, however are able to vouch for your safety. The records from Dr. Sipich, through 10/10/06 note depression is stronger, however, deny suicidal plan or interest. It was indicated that you had chronic pain complaints and trying to find ways to distract yourself.

As part of our review your file was reviewed by a Medical Case Manager. The Medical Case Manager corresponded with Dr. Swearingen in order to discuss your functional status. Dr. Swearingen was provided with a copy of the video footage obtained during the activities checks, the investigative report as well as a copy of your in-person interview for his review. In this correspondence, he was not asked to provide "clearance" or a "release" to return to the workforce nor was he asked to provide a "return to work status" or a vocational opinion. Instead, he was asked to opine on The Hartford's assessment regarding your residual functional capabilities, which in part included the totality of the medical evidence, the functional abilities verbalized during the in-person interview, and the abilities demonstrated during the activities check. If they disagreed with our assessment, he was instructed to provide specific restrictions and limitations along with the medical rationale and evidence supporting such restrictions. Dr. Swearingen was advised that our assessment concluded that you are capable of physically performing in a full- time, sedentary-type functional capacity which requires Intermittent periods of walking/standing and; allows for the use of the upper extremities, such as with frequent fingering and handling, lifting/carrying limited to 10 pounds occasionally. Sitting for the majority of the workday, however, afforded will be the opportunity to change body positions/postures as needed for comfort (by walking, standing, or moving about).

Dr. Swearingen replied to our office in a signed statement on 05/07/07, indicating that he was not comfortable replying to the assessment until an additional assessment can be done and would request a functional capacities evaluation.

Although we respect the opinion of Dr. Swearingen concerning our assessment, we disagree with such, as you demonstrated during the period of observations that you remain functional and independent and capable of performing activities that would exceed the functional assessment described in our inquiry.

In order to give your claim every consideration we involved the services of two medical consultants to address the various physical and behavioral health issues involved in your claim. Dr. Gregg Marella, Board Certified Internal Medicine and Dr. Charles Clark, Board Certified Psychiatry and Addiction Psychiatry from Reliable Review Services reviewed your records and corresponded with Dr. Swearingen and Dr. Whisenand to discuss your status.

In his report dated 05/29/07, Dr. Marella indicated that the documented activities, your own representations and the lack of current medical information to suggest that your previous history of heart disease, ongoing back pain chest pain or Fibromyalgia limit your ability to work in a sedentary capacity. In his report he also noted that the prior history of bladder cancer would limit your work capacity in any way. Likewise without any orthopedic, physical therapy or pain management recommendations or notations, it cannot be noted that you are limited in your ability to perform in a sedentary capacity as previously described. It was noted that the observations made would clearly suggest that you have no limitations or restrictions for sedentary and light duty work. Dr. Marella made various attempts to communicate with Dr. Whisenand; however, his efforts were unsuccessful.

In his report, Dr. Clark noted that the information shows that given the totality of the medical evidence and other information available it is reasonable that you are capable of performing a variety of duties utilizing judgment and decision making, dealing with and being around people and capable of attaining precise set limits. It was noted that the activities documented during the period of observations speak to your ability to do the basic functions of life and are able to function socially while apparently on significant doses of psychotropic medications. He noted that it is possible that you might be able to perform at a higher level than previously stated, but it was uncertain. Dr. Swearingen and Dr. Whisenand declined discussing the case with Dr. Clark.

After completing both assessments it was concluded that you should be capable of performing at a sedentary level of function based on the totality of the information.

Effective 12/25/98, your policy requires that you remain continuously unable to engage in any occupation for which you are or could become qualified by education, training or experience. In an effort to provide a fair review of your functional ability as it would relate to gainful employment, a vocational review was completed by a Hartford Vocational Case Manager. This review considered the imposed restrictions, your signed statement and observed activities on video surveillance, along with your education, training and experience. Based upon this analysis, it is our determination that you have sufficient skills that would allow you to be readily employable in the positions of Director, Financial Responsibility Division, Hospital Insurance Representative, Manager, Fish-and Game Club, Supervisor, Blood Donor Recruiters, Driver's License Examiner and Management Trainee. Please note that these occupations are a sample of occupations and not intended to be a comprehensive list of all occupations for which you may be qualified.

Based upon the information in your file, the weight of evidence does not support impairments to such a degree of severity to prevent you from returning to work with reasonable restrictions and limitations as evidenced by the medical review, video surveillance and the vocational assessment. You were documented engaging in activities as described above, which were not congruent with

your previously reported limitations. At the same time you have reported being capable of performing various activities that exceed the functional level assessed. One of your treating physicians replied to our functionality inquiry noting that he would not respond to our assessment and the need to perform further testing. Although we respect his opinion, we understand that the evidence gathered in the course of our investigation demonstrates that you remain functional and are capable of engaging in various activities, you have also indicated being capable of performing and the medical records also document activities that exceed the functional assessment made. Through an independent review of the evidence, it was determined that you are capable of functioning at least in a sedentary level of function and upon completion of the vocational assessment as outlined above, alternative occupations were identified. Therefore, we find that you no longer satisfy the definition of disability as established in the policy, as the information does not support that you remain continuously unable to engage in any occupation for which you are or become qualified by education, training or experience, and benefits are hereby terminated 06/29/07.

The Employee Retirement Income Security Act of 1974 ("ERISA") gives you the right to appeal our decision and receive a full and fair review. You may appeal our decision even if you do not have new information to send to us. You are entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to your claim. If you do not agree with our denial, in whole or in part, and you wish to appeal our decision, you or your authorized representative must write to us within one hundred eighty (180) days from the receipt of this letter. Your appeal letter should be signed, dated and clearly state your position. Please include your printed or typed full name, Policyholder, and at least the last four digits of your Social Security Number with your appeal letter (i.e.xxx-xx-1234). Along with your appeal letter, you may submit written comments, documents, records and other information related to your claim.

Once we receive your appeal, we will again review your entire claim, including any information previously submitted and any additional information received with your appeal. Upon completion of this review, we will advise you of our determination. After your appeal, and if we again deny your claim, you then have the right to bring a civil action under Section 502(a) of ERISA.

Please send your appeal letter to:
The Hartford
Claim Appeals Unit
Benefit Management Services
P.O. Box 946710
Maitland, FL 32794-6710

If you have any questions, you may contact our office at Toll Free (800) 741-4306. Our office hours are 8:00 AM to 8:00 PM EST, Monday through Friday.

Respectfully,

s/ Jorge L. Pagan

Jorge L. Pagán
Investigative Analyst
Special Investigations
Group Benefits Division

Benefit Management Services
Maitland Claim Office
P.O. Box 946710
Maitland, FL 32794-6710
Fax (407) 919-6329

**E-FILED**
Thursday, 27 March, 2008 40:54:49 AM
Clerk, U.S. District Court, ILCD



J. Michael O'Byrne
*Of Counsel*

Edward H. Rawles*

Stephen M. O'Byrne

Glenn A. Stanko

Brett A. Kepley

Timothy S. Jefferson■

*Licensed in Illinois and Colorado
■Licensed in Illinois and Missouri

**RAWLES
O'BYRNE
STANKO
KEPLEY
&
JEFFERSON**
P.C.

ATTORNEYS AT LAW

Reno, O'Byrne
1952-1962

Reno, O'Byrne
& Kepley
1962-1984

Reno, O'Byrne
& Kepley, P.C.
1984-1994

Rawles, O'Byrne,
Stanko & Kepley, P.C.
1994-2005

*E-mail Address*
gastanko@rosklaw.com

December 6, 2007

**VIA CERTIFIED MAIL -
RETURN RECEIPT REQUESTED**

The Hartford
Claim Appeals Unit
Benefit Management Services
P.O. Box 946710
Maitland, FL 32794-6710

|  | Re: | My Client/Claimant: | Michael D. McCoy |
|---|---|---|---|
|  |  | Policy Holder: | Insurance Risk Managers, Ltd. |
|  |  | Policy Number: | 83025950 |
|  |  | Administered by: | The Hartford |
|  |  | Underwritten by: | Continental Casualty Company |

Gentlemen/Ladies:

On behalf of Michael D. McCoy, I hereby appeal Hartford's decision terminating Mr. McCoy's long-term disability benefits. That decision was communicated in a letter from Jorge L. Pagan dated June 29, 2007. It is our position that Mr. McCoy continues to be totally disabled within the terms of the applicable group policy issued by Continental Casualty Company, as he has been for more than 13 years.

The following additional documents are enclosed in support of Mr. McCoy's appeal:

1.    An affidavit dated October 9, 2007, from Mr. McCoy's former treating psychiatrist, Dr. Allan Crandell.

2.    An affidavit dated October 24, 2007, from Mr. McCoy's long-time treating psychologist, James F. Sipich, Ph.D.

3.    An affidavit dated October 26, 2007, from Mr. McCoy's current treating psychiatrist, Dr. James M. Whisenand.

4.    An affidavit dated November 13, 2007, from one of Mr. McCoy's former partners, Anthony R. Ackerman.

5.    An affidavit dated November 14, 2007, from Rebecca Jones, who formerly worked with Mr. McCoy.

6.    An affidavit dated December 5, 2007, from Mr. McCoy.

**EXHIBIT E**

The Hartford
December 6, 2007
Page Two

A curriculum vitae has been included in the respective affidavits of Dr. Crandell, Dr. Sipich, and Dr. Whisenand.

As a preliminary matter, I should note that I requested a copy of the Hartford claim file by letter dated July 12, 2007. The claim file was sent to me by correspondence dated July 23, 2007. Two computer disks were sent along with the claim file, which supposedly showed the video taken of Mr. McCoy by Titan Investigative Alliance, LLC, on September 18-20, 2006. We were able to view only the video contained on the first disk, which appears to be all of the video taken at Mr. McCoy's residence. The second disk simply did not show anything. By facsimile correspondence dated November 13, 2007, I asked for new copies of the two disks. They were promptly provided to me. This time, however, we were unable to view the first disk at all, while only part of the second disk was viewable. The second disk appeared to contain the video taken at locations other than Mr. McCoy's home. We were able to view it only through 2:05:56 p.m. on September 19, 2006.

In summary, it appears that we had all of the video taken of Mr. McCoy at his home on the first disk of the first pair, and that we had part of the video of his activity away from home on the second disk of the second pair. Beyond the point where the video was no longer viewable on the second disk, we have had to rely solely on the report of Titan Investigative Alliance for what was supposedly shown on the videotape.

Based on my review of the applicable long-term disability policy issued by Continental Casualty Company, the following definition of "Total Disability" is the one to be used in determining whether Mr. McCoy is entitled to continued benefits:

"Total Disability" means that, because of Injury or Sickness, the Insured Employee is:

(1)    continuously unable to engage in any occupation for which he is or becomes qualified by education, training or experience; and

(2)    under the regular care of a licensed physician other than himself.

The termination letter dated June 29, 2007, uses this definition and, therefore, appears to confirm my understanding.

The termination decision does not suggest that Mr. McCoy does not satisfy part 2 of the definition of "Total Disability." In fact, the statement taken from Mr. McCoy on October 25, 2006, as well as his affidavit, confirm that he is under the regular care of two licensed physicians (Dr. Swearingen and Dr. Whisenand), one of whom is a psychiatrist (Dr. Whisenand). He is also under the regular care of a licensed clinical psychologist (Dr. Sipich).

Hartford's decision to terminate Mr. McCoy's long-term disability benefits because he no longer satisfies part 1 of the definition of "Total Disability" was erroneous for the following reasons:

1.    It is evident from Mr. Pagan's letter of June 29, 2007, that the decision to terminate Mr. McCoy's disability benefits was predicated largely on surveillance of Mr. McCoy conducted by Titan Investigative Alliance on September 18-20, 2006. According to the written report of Titan Investigative Alliance, approximately 72 minutes of videotape was taken in

The Hartford
December 6, 2007
Page Three

conjunction with the surveillance. The report reflects that most of the videotape was taken on September 19, that the videotape shows Mr. McCoy mowing two lawns, and that it also shows Mr. McCoy loading and unloading his mowers from a trailer hitched to his car.

The written report of Titan Investigative Alliance documents less than 74 minutes of actual mowing activity on September 19. Some of the time involved loading and unloading the lawn mowers from Mr. McCoy's trailer at the mowing sites. He was at one location for only 20 minutes in the morning. He was at the second location for 54 minutes in the afternoon. More than 2 ½ hours passed between when Mr. McCoy left the first site and arrived at the second site. In his investigation report, the Hartford investigator, Fred Diggle, incorporated these same time frames.

The assumption seems to have been that Mr. McCoy's disability was based only on physical limitations. However, his disability has always been a combination of physical and mental factors. For example, in a CNA file review dated September 15, 1997, the reviewer stated the following:

> The file material which I had for review indicates that this man is medically stable and that it is the depression and anxiety related to the medical problems which was creating the disability.

Earlier in that same note, the reviewer mentioned a diagnosis of coronary artery disease and a secondary diagnosis of "Major Depression/Recurrent." About six months later, in a file entry dated April 22, 1998, Mr. McCoy's "multiple medical problems" and his "Mental Health problems" were both mentioned. That same entry also noted that Mr. McCoy was "barely able to function."

In short, the termination decision failed to focus on the psychological aspect of Mr. McCoy's disability. Instead, the termination decision was based on less than 1 ½ hours of limited physical activity that occurred on only one day of the week. As will be discussed below, the psychological component of Mr. McCoy's disability is a major part of his overall disability picture.

      2.     The affidavits of Dr. Allan Crandell, Dr. James Whisenand, and Dr. James F. Sipich collectively document Mr. McCoy's ongoing battle with major recurrent depression from May 3, 1993, to the present. Those affidavits also contradict assumptions made in the employability assessment regarding Mr. McCoy's capabilities. Finally, those affidavits establish Mr. McCoy's continuing inability to work due to his psychological problems.

Dr. Crandell, who is a psychiatrist, treated Mr. McCoy from May 3, 1993, through April 26, 2005. (Crandell aff., par. 4) Dr. Crandell's affidavit sets forth his diagnosis of major depressive episode with serious, recurrent symptoms. (Crandell aff., par. 5) His affidavit relates how Mr. McCoy's recurrent depression was interlaced with temper problems. (Crandell aff., par. 8) Dr. Crandell's affidavit also details Mr. McCoy's hospitalization twice in 1997 due to his psychiatric problems, one of which was secondary to a suicide attempt. (Crandell aff., par. 9) As late as February 2003, Mr. McCoy had expressed to Dr. Crandell that he did not wish to remain living. (Crandell aff., par. 10)

Dr. Crandell's affidavit sets forth several opinions based on his treatment of Mr. McCoy over a period of approximately 12 years. In his professional opinion, Mr. McCoy's psychological condition is permanent, and Mr. McCoy will always suffer from this condition.

The Hartford
December 6, 2007
Page Four

(Crandell aff., par. 11)  Furthermore, in Dr. Crandell's opinion, "Mr. McCoy absolutely could not function in a full-time management position of any kind." (Crandell aff., par. 12)  He goes on to say that Mr. McCoy's depression and temper problems are such that he would be incapable of directing, controlling, or planning the activities of others, dealing with people (beyond receiving work instructions), or making the requisite judgments and decisions necessarily made by a manager in the workplace. (Crandell aff., par. 12)  According to Dr. Crandell, Mr. McCoy is barely able to cope with the basic personal activities of daily living, and he would be "completely unable to handle the stress of any work environment, especially one involving management duties and responsibilities." (Crandell aff., par. 12)

Dr. Crandell's affidavit states that Mr. McCoy was not capable of performing gainful employment of any kind during the period of time that Dr. Crandell was providing psychotherapy services and medications, considering Mr. McCoy's many physical health problems and considering his emotional and mental condition.  Therefore, Dr. Crandell considered Mr. McCoy to be totally disabled.  (Crandell aff., par. 13)  Finally, in Dr. Crandell's opinion, Mr. McCoy will never be capable of performing gainful employment of any kind and will, therefore, be totally disabled for the remainder of his life. (Crandell aff., par. 14)

The affidavit of James M. Whisenand, who is Mr. McCoy's current treating psychiatrist, offers similar opinions regarding Mr. McCoy's inability to function in a full-time management position of any kind, and his inability to direct, control, or plan the activities of others, deal with people (beyond receiving work instructions), or to make the various judgments and decisions required to be made by a manager in the workplace. (Whisenand aff., par. 9)  Again, Dr. Whisenand expresses the opinion that Mr. McCoy is barely able to cope with the basic personal activities of daily living, and that he would be completely unable to handle the stress of any work environment, especially one involving management duties and responsibilities. (Whisenand aff., par. 9)  Dr. Whisenand also expresses the opinion that Mr. McCoy is incapable of performing gainful employment of any kind and will never be capable of performing gainful employment.  Therefore, he will be totally disabled for the remainder of his life. (Whisenand aff., par. 10)  In fact, in the report attached as Exhibit B to Dr. Whisenand's affidavit, he finds that Mr. McCoy is now totally disabled from a psychiatric standpoint alone, irrespective of his physical disability.

Finally, the affidavit of James F. Sipich, who has been Mr. McCoy's treating clinical psychologist since 1998, and who had seen Mr. McCoy a total of 336 times between then and the time of his affidavit, expresses findings and conclusions similar to those of the two psychiatrists. (Sipich aff., par. 6, 8-12)

The findings and conclusions of Mr. McCoy's treating psychiatrists and psychologist render the employability assessment useless.  Both the assessment and the positions identified by the assessment were predicated on the assumption that Mr. McCoy is capable of directing, controlling, or planning the activities of others, dealing with people (beyond receiving work instructions), and making the various judgments and decisions required to be made by a manager in the workplace.  The affidavits of Dr. Crandell, Dr. Whisenand, and Dr. Sipich directly contradict that assumption.

In summary, from a psychiatric and psychological standpoint, Mr. McCoy is incapable of performing the job functions that the employability assessment assumed he can do.  Furthermore, according to his treating psychiatrists and psychologist, Mr. McCoy is not capable of gainful employment, is totally disabled, and will be totally disabled for the remainder of his life.

The Hartford
December 6, 2007
Page Five

3.       The affidavits of Anthony R. Ackerman and Rebecca Jones provide observations
and lay opinions that confirm what Mr. McCoy's psychiatrists and psychologist have said.  Mr.
Ackerman is one of Mr. McCoy's former partners who has maintained ongoing contact with him.
(Ackerman aff., par. 2, 8)  Ms. Jones formerly worked with Mr. McCoy and has also maintained
contact with him.  (Jones aff., 2, 9)  Their affidavits document the changes that Mr. McCoy went
through in the early 1990's, including his temper problems and his memory problems.
(Ackerman aff., par. 3-7, 10; Jones aff., par. 5-8)  Their affidavits also speak to Mr. McCoy's
lack of improvement and continued regression, his ongoing emotional instability and memory
problems, his tendency to injure himself, his lack of both basic skills and management skills, his
inability to perform the types of functions that were assumed by the employability assessment,
and his current inability to work.  (Ackerman aff., par.  10-14, 16-17; Jones aff., par. 9-11)  Mr.
Ackerman's affidavit discloses that he has been involved in hiring decisions himself in the past,
that Mr. McCoy's physical and mental deficiencies would quickly become apparent during the
interview process, and that no employer would hire Mr. McCoy.  (Ackerman aff., par. 15)  In
other words, Mr. Ackerman considers Mr. McCoy to be unemployable.  (Ackerman aff., par. 15)
Ms. Jones concludes by saying that the suggestion that Mr. McCoy might somehow be able to
work in a management position is "totally unrealistic."  (Jones aff., par. 11)

4.       The Hartford claim file is replete with statements by Mr. McCoy's physicians,
including his psychologist and psychiatrist, that he is both totally and permanently disabled.  Dr.
James F. Sipich (Mr. McCoy's psychologist) stated in a report submitted to the Illinois
Department of Rehabilitation Services on May 9, 1995, that Mr. McCoy was "fully disabled."
Similarly, in a CNA disability claim form dated September 5, 1995, Dr. Sipich said that Mr.
McCoy was totally disabled from his job and from any other work.  According to Dr. Sipich, Mr.
McCoy could not perform any duties which required focus and concentration.  Dr. Sipich also
said that the underlying causal conditions were chronic and permanent.  In addition, he said that
"psychological factors combine with severe pain and physical limitations to render this person
disabled."

In a physician statement for CNA dated May 8, 1997, Dr. Allan Crandell (Mr. McCoy's
psychiatrist) advised that no return to work was envisioned at that time.  In his physician
statement submitted to CNA dated May 9, 1997, Dr. Jeffrey V. Swearingen (Mr. McCoy's
primary care physician) said that Mr. McCoy was "permanently disabled."  Dr. Sipich stated in
his CNA physician statement dated May 16, 1997, that it was not likely that Mr. McCoy would
ever be able to return to work.

Similarly, in a physician statement submitted to CNA dated September 9, 1997, Dr.
Sipich said that it was "extremely unlikely that he will ever be physically or emotionally able to
return to work."

In a report to Allsup Incorporated dated October 27, 1995, Dr. Sipich wrote the
following:

> I have diagnosed his condition as Major Depression, Recurrent (DSM IV 296.30).
> His prognosis is very poor.  His psychological condition is chronic and is related
> to various chronic physical problems that other doctors will document for you.
> As noted in my questionnaire, his symptoms incapacitate him in terms of
> vocational and social situations.  There has been slow, continued deterioration for
> some time, certainly since May of 1995.  In addition to general symptoms of
> vegetative depression, e.g. loss of interest and pleasure, sleep disturbance,

The Hartford
December 6, 2007
Page Six

psychomotor retardation and loss of energy and stamina, his memory and ability to think and concentrate is severely impaired. It is very typical of him to lose his train of thought frequently, to be unable to remember words, names or the point he is trying to make. These difficulties, in turn, cause him to be very frustrated and angry with himself.

Mr. McCoy is very unstable emotionally. He becomes tearful very easily. He is volatile and unpredictable and prone to making poor judgments in all situations. His depression and related anxiety interfere with his ability to comprehend what is being said. It would be impossible as an employer to have any confidence that he could understand or carry out the expectations that were part of his work responsibilities. I cannot state more strongly my assessment of Mr. McCoy's inability to function. I believe his disability is profound and permanent.

A medical assessment accompanying that report contained similar opinions and conclusions. As reflected by the affidavits of Dr. Crandell, Dr. Whisenand, and Dr. Sipich, nothing has changed.

Dr. Swearingen found Mr. McCoy to be "permanently disabled" in another physician statement submitted to CNA on October 14, 1998.

In a disability form dated March 31, 2004, Dr. Soo Park (Mr. McCoy's cardiologist), said that Mr. McCoy was totally disabled from his job and from any other work and was "never" expected to recover sufficiently to perform duties. In a Hartford disability claim form dated April 24, 2005, Dr. Swearingen said that Mr. McCoy was totally disabled from his job and from any other work, and that he did not expect any fundamental or marked change in the future.

The Hartford claim file also reflects that Mr. McCoy was long ago viewed by CNA as having a disability that was not only total, but was also permanent. In a checklist dated October 7, 1999, the following entry was checked: "Disability expected to be total and continuous and all rehab issues resolve[d]."

In short, the termination decision is inconsistent with the numerous opinions expressed by Mr. McCoy's treating physicians and psychologist that his disability was not only total, but was also permanent. It is also inconsistent with the disability carrier's past recognition and acknowledgment that Mr. McCoy's disability was both total and permanent.

5.    The first part of the definition of "Total Disability" says that the "Insured Employee must be "continuously unable to engage in any occupation for which he is or becomes qualified by education, training, or experience." Mr. McCoy's occupation was that of an insurance producer for approximately two decades before he first became disabled in 1994. (McCoy aff., par. 9-13) It is clear that he does not have the education, training, or experience to perform any of the kinds of positions identified by Hartford in the termination letter. (McCoy aff., par. 14-15) Those positions include Director of a Financial Responsibility Division, Hospital Insurance Representative, Manager of a Fish and Game Club, Supervisor of Blood Donor Recruiters, a Driver's License Examiner, and a Management Trainee. The positions of Director of a Financial Responsibility Division and a Driver's License Examiner are state positions that would require Mr. McCoy to take and pass a civil service exam, do well enough to be selected, and have some political connections. (McCoy aff., par. 15)

The Hartford
December 6, 2007
Page Seven

Mr. McCoy has only a high school education, generally getting grades in the C- and D range, except for music classes. (McCoy aff., par. 4) He apparently is dyslexic. (McCoy aff., par. 17) Mr. McCoy has never taken any college or junior college coursework of any kind. (McCoy aff., par. 5) The only form of education that he has beyond high school is a trade school course that taught him to be an auto mechanic. (McCoy aff., par 6) He has never held a management position. (McCoy aff., par. 14) Mr. McCoy does not use a computer, does not know how to send or receive e-mail, and does not know how to use the Internet. (McCoy aff., par. 16) It is apparent from his affidavit, as well as the affidavits of Anthony R. Ackerman and Rebecca Jones, that he does not have the education, training, or experience to perform any of the types of managerial positions identified by Hartford. Furthermore, all of the affidavits establish that Mr. McCoy simply does not have the attributes necessary for him to be able to function in a management position. Mr. McCoy obviously cannot work as an insurance producer or an automobile mechanic, and there is clearly no other occupation for which he is qualified by education, training, or experience.

6.      The Hartford termination decision appears to presume that Mr. McCoy would no longer be totally disabled if he could become qualified for some other occupation through education or training. That presumption is erroneous. If Mr. McCoy either happens to be or becomes qualified to perform an occupation within his physical and mental limitations as a result of his education, training, or experience, then he would no longer be considered to be disabled. However, there is nothing in the disability policy that requires the insured employee to take affirmative steps by way of education or training in order to become qualified to perform some other occupation.

In this case, Mr. McCoy is only qualified to be an insurance producer by way of training and experience. However, that job is clearly beyond his present mental and physical capabilities. It is also obvious that Mr. McCoy does not have the education, training, or experience necessary in order to perform the types of jobs identified by the employability assessment. As reflected by its title, even the position of "Management Trainee" would require training. The disability policy simply does not require Mr. McCoy to obtain the education or training necessary to perform some other occupation, even if he were mentally and physically able to do so. Therefore, he remains totally disabled under the terms of the policy.

7.      The combination of all of a claimant's conditions should be considered. *See, Abram v. Cargill,* 395 F.3d 882, 887 (8th Cir. 2005); *Garrett v. Hartford Life and Acc. Ins. Co.,* 2007 WL 3374671 at *9 (E.D.Ark., 11/08/07) Pain is one of those conditions because pain itself can be severe and disabling. *Mullally v. Boise Cascade Corp. Long Term Disability Plan,* 2005 WL 66070, p. 5 (N.D.Ill. 2005). Subjective complaints of pain are to be considered, along with any pain medication taken and any pain treatments received. *See, Diaz v. Prudential Ins. Co. of America,* 499 F.3d 640, 645-646 (7th Cir. 2007).

In this case, of course, there can be no dispute about the various physical health problems that Mr. McCoy has suffered over the years. Those conditions are well documented in the Hartford claim file, as well as by the affidavits of Mr. McCoy's treating psychiatrists and psychologist. (Crandell aff., par. 6; Sipich aff., par. 5; Whisenand aff., par. 5) They include multiple myocardial infarctions, heart bypass surgery, multiple stents, bladder cancer, a urostomy, blood clots, an appendectomy, a penile prosthesis, and a fractured wrist.

Mr. McCoy's chronic pain is also well documented. The affidavits of Mr. McCoy's psychiatrists and psychologist attest to his reports of high levels of pain to them, as well as their personal observations from which they concluded that he was in pain. (Crandell aff., par. 7;

The Hartford
December 6, 2007
Page Eight

Sipich aff., par. 7; Whisenand aff., par. 7)  In their affidavits, Mr. Ackerman and Ms. Jones also testify about their observations of Mr. McCoy's high level of pain.  (Ackerman aff., par. 9; Jones aff., par. 9)  As Mr. Ackerman put it, "Mike appears to be suffering from a horrifying amount of pain most of the time."  (Ackerman aff., par. 9)  In addition, Mr. Ackerman and Ms. Jones both mention the large amount of pain medication that Mr. McCoy takes.  (Ackerman aff., par. 9; Jones aff., par. 9)

The report of the Hartford investigator, Fred Diggle, also confirms Mr. McCoy's pain situation.  In reporting his visit with Mr. McCoy, Mr. Diggle stated that Mr. McCoy had to get up from the kitchen chair at least every 15 minutes, that he complained of pain when he was sitting, and that he would pace around the room for five minutes at a time.  Mr. Diggle also noted Mr. McCoy's admittedly excessive use of Vicodin and Advil because of his pain levels.  In the statement that he took from Mr. McCoy, Mr. Diggle documented Mr. McCoy's repeated references to the pain that he suffers and the large amounts of Vicodin (50 per month) and Advil (250 per month) that he takes.  In addition, Mr. Diggle noted Mr. McCoy's statement regarding the high pain levels that he suffers when he sits for more than 15 or 20 minutes without standing (8 on a scale of 10), stands without moving around (9/10), and climbs stairs (9/10).

There can simply be no doubt that Mr. McCoy suffers from chronic pain of a very high degree.  In order to do any lawn mowing, he has to take 8 or 9 Vicodin and six Advil for each Vicodin, which means that he takes 48-54 Advil in just one day.  (McCoy aff., par. 24)

The prescription lists from Mr. McCoy's pharmacy, copies of which are attached to his affidavit along with information relating to each medication, document his monthly prescription for Vicodin (hydrocodone), which is a pain medication.

Mr. McCoy has not just attempted to solve his chronic pain problems with medication.  The affidavits of Dr. Crandell and Dr. Sipich, as well as Mr. McCoy's affidavit, document the fact that he received biofeedback treatments at one time for his pain condition.  (Crandell aff., par. 7; Sipich aff., par. 7; McCoy aff., par. 26)  In addition, Mr. McCoy has recently gone through acupuncture treatment at Carle Clinic for his back and hip pain, with mixed results.  (McCoy aff., par. 26)

In summary, Mr. McCoy has multiple physical ailments, chronic and severe pain, and significant psychological problems.  Although any one of these conditions is, by itself, sufficient to render him totally disabled and unemployable, the combination of all of these conditions leaves no doubt whatsoever regarding his total disability.

8.     For purposes of the employability assessment, it was assumed that Mr. McCoy could do sedentary work, which was defined as follows:  "Lifting, Carrying, Pushing, Pulling 10 Lbs. occasionally.  Mostly sitting, may involve standing or walking for brief periods of time."  This definition is the one utilized by the United States Department of Labor in the Dictionary of Occupational Titles.  Based on Mr. Diggle's account of how often Mr. McCoy stood up during the interview, how long he walked around, and his complaints of pain after sitting for more than 15 or 20 minutes, it is obvious that Mr. McCoy could not physically do a job that involved "mostly sitting."  Therefore, the premise that Mr. McCoy can do sedentary work is contradicted by the facts.

9.     The termination decision failed to take into account the fact that Mr. McCoy has continuously been on Social Security Disability since he was found to be eligible for disability benefits beginning February 5, 1994.  (McCoy aff., par. 28)  The finding by the Social Security

The Hartford
December 6, 2007
Page Nine

Administration means that it determined that Mr. McCoy is unable to engage in any substantial gainful activity. (*See* 40 U.S.C. §423(d)(1))  Under the Social Security Act, Mr. McCoy's inability to engage in any substantial gainful activity means that he is unable to engage in any "substantial gainful work which exists in the national economy."  (*See* 40 U.S.C. §423(d)(2))  The Social Security Disability finding serves to establish part 1 of the definition of "Total Disability" - *i.e.*, that Mr. McCoy is continuously unable to engage in any occupation for which he is or becomes qualified by education, training, or experience.  Although the Social Security and the policy definitions of disability are not identical, the difference is considered to be minor, and the fact that the employee is on Social Security disability is evidence to be taken into account.  *Diaz* at pp. 644-645.

Mr. McCoy has drawn Social Security Disability benefits continuously since he was first determined to be disabled by the Social Security Administration.  (McCoy aff., par. 28)  Those benefits have now extended over a period that will soon reach fourteen years.  Hartford's claim that Mr. McCoy is somehow capable of working is entirely at odds with the determination of the Social Security Administration and its continued adherence to that finding.

Mr. McCoy's receipt of Social Security Disability benefits takes on even greater significance because of the role of the disability carrier in getting those benefits.  The Hartford claim file reflects that CNA compelled Mr. McCoy to file a claim for Social Security Disability benefits, and it offered the services of Allsup & Associates at no cost to Mr. McCoy.  Mr. McCoy complied with CNA's demand by signing the form appointing Allsup & Associates as his representative.  After Allsup & Associates gave CNA notice that Mr. McCoy's Social Security Disability claim had been allowed, CNA then took advantage of the Social Security finding and required Mr. McCoy to reimburse it for its overpayments.  Mr. McCoy's affidavit confirms what is reflected by the Hartford claim file.  (McCoy aff., par. 28)

Where, as here, the disability carrier has assisted the claimant with making a Social Security Disability claim, and where, as here, the carrier has benefited from a Social Security award by receiving an offset against the payments that it is obligated to make, courts have weighed those factors against the carrier.  *See, Ladd v. ITT Corp.*, 148 F.3d 753, 756 (7th Cir. 1998); *Calvert v. Firstar Finance, Inc.,* 409 F.3d 286, 293-295 (6th Cir. 2005).

10.    Finally, although the physical activities of Mr. McCoy recounted in the termination decision are basically irrelevant, it should be noted that they have been substantially overblown.  For example, based on my review of the report submitted by Fred Diggle (which is based on the report submitted by Titan Investigative Alliance), Mr. McCoy was observed mowing two lawns for a total of 74 minutes.  (It appears that the video shows only a portion of those 74 minutes.)  One lawn was done in the morning and took only 20 minutes.  Mr. Diggle's report mentions both a "mower and a riding mower."  It does not say how long Mr. McCoy used each, nor does it bother to mention that Mr. McCoy's push mower is self-propelled and very light.  (McCoy aff., par. 23)  The video reflects that the self-propelled push mower was used for less than three and one-half minutes on the lawn that was cut in the morning.

The second lawn was done in the afternoon after more than a two and one-half hour break, and took 54 minutes according to the report.  Mr. Diggle's report does not specify whether a riding mower or push mower was used, or both, although the report of Titan Investigative Alliance mentioned only a riding mower.  Mr. McCoy was not observed engaging in other lawn mowing activities that day, and he was not observed engaging in lawn mowing activities on any other day of the week.

The Hartford
December 6, 2007
Page Ten

According to Mr. McCoy's affidavit, he only engages in lawn mowing activities during the growing season, usually only for a small part of the day (2 to 3 hours maximum), and generally only on one day of the week. In some cases, the lawn mowing might extend over parts of two days. (McCoy aff., par. 23) Even though Mr. McCoy devotes only a small number of hours to lawn mowing in any one week, he has to take massive amounts of pain medication to do so. (McCoy aff., par. 24) He could not get enough pain medication to engage in that level of activity on a daily basis. (McCoy aff., par. 24)

The video itself belies other claims made in the termination letter. For example, it says that Mr. McCoy walked "with a normal gait." As I viewed those parts of the video that could be viewed, "hobble" comes to mind as the word that would best characterize Mr. McCoy's gait. At a minimum, it would have to be called a "shuffle." It is interesting to see how Mr. McCoy looks when walking next to the two other people with whom he exited the restaurant. Although all of them had their hands in their pockets, Mr. McCoy appeared to sway back and forth as he walked compared to the others. Their gaits would more likely be characterized as "normal." Mr. McCoy's gait was clearly something different.

The report from Titan Investigative Alliance leads one to wonder about the veracity of the investigators. For example, the report said that no brace was observed. In viewing the video however, it is obvious that Mr. McCoy was wearing a brace on his right hand, as he was in the photograph taken of him by Mr. Diggle. In his statement to Mr. Diggle, Mr. McCoy reported that he had lost 85% use of his right hand after he broke his wrist.

In addition, the termination letter claimed that Mr. McCoy "demonstrated the ability to bend at the waist on multiple occasions to 90 degrees and greater, rising to an upright position in a swift fluid motion." That information came from the Titan Investigative Alliance report. Given the camera angle, however, with weeds and trees in front of it, it appears very questionable that anyone was in a position to make the observations that were claimed. They certainly are not apparent on the video that we were able to view.

Again, Mr. Diggle's report serves to document Mr. McCoy's various infirmities. It noted that he did not ambulate well at the meeting, and that he was limping and shuffling. He noted that Mr. McCoy had trouble remembering names and places in connection with his medical history, including being unable to recall the names of his doctors or where their offices were located. He said that Mr. McCoy cried four or five times during the meeting, and that he became emotional when talking about his anger management problems. In fact, he had a friend on "standby" in case he became upset. According to Mr. Diggle, Mr. McCoy said that he had to take two Vicodin and ten Advil to get through the meeting. Finally, Mr. Diggle noted that Mr. McCoy did not read or sign his statement because he said that it would take him two hours to do so. According to Mr. Diggle, Mr. McCoy's wife read and signed the statement. In his affidavit, Mr. McCoy states that he did not read the statement because he was in pain and was exhausted, and his wife did not read it back out loud to him. (McCoy aff., par. 29) Mr. McCoy thought he actually signed the statement after his wife said it looked all right to her. (McCoy aff., par. 29) In any event, the observations of Mr. McCoy made by Mr. Diggle are hardly consistent with someone who has the ability to work in a management level position.

Mr. McCoy should be commended, rather than punished, for at least trying to do something a little bit physical. His ability to spend two or three hours a week mowing several lawns bears no relationship to any ability to function in a full-time management level position eight hours a day, five days a week. As the Seventh Circuit Court of Appeals observed in *Diaz*,

The Hartford
December 6, 2007
Page Eleven

the difference between a person's being able to engage in sporadic activities and being able to work eight hours a day five consecutive days of the week must be considered. *Diaz* at p. 648. Hartford's termination of Mr. McCoy's disability benefits based on this minimal physical activity, which did not require Mr. McCoy to interact with anyone else or direct the activities of anyone else, and which did not consider his psychological limitations, was entirely misdirected.

Each of the above reasons, by itself, is sufficient to reverse the decision of Hartford to terminate Mr. McCoy's long-term disability benefits. The termination decision should be overturned. Mr. McCoy's benefits should be reinstated, and all of his unpaid benefits since the termination decision should be paid, together with interest at an appropriate rate.

Very truly yours,

RAWLES, O'BYRNE, STANKO, KEPLEY & JEFFERSON, P.C.

S/ Glenn A. Stanko

Glenn A. Stanko

GAS/jrh
Enclosures
cc:  Michael D. McCoy (w/enc.)

J. Michael O'Byrne
*Of Counsel*
———
Edward H. Rawles*
———
Stephen M. O'Byrne
———
Glenn A. Stanko
———
Brett A. Kepley
———
Timothy S. Jefferson▪

*Licensed in Illinois and Colorado
▪Licensed in Illinois and Missouri



RAWLES
O'BYRNE
STANKO
KEPLEY
*&*
JEFFERSON
P.C.
ATTORNEYS AT LAW

O'Byrne & O'Byrne
1952-1962
———
Reno, O'Byrne
& Kepley
1962-1984
———
Reno, O'Byrne
& Kepley, P.C.
1984-1994
———
Rawles, O'Byrne,
Stanko & Kepley, P.C.
1994-2005

*E-mail Address*
gastanko@rosklaw.com

February 4, 2008

**VIA CERTIFIED MAIL -**
**RETURN RECEIPT REQUESTED**

Marsha L. Macko, Appeal Specialist
The Hartford
Claim Appeals Unit
Benefit Management Services
P.O. Box 946710
Maitland, FL  32794-6710

|  |  |  |
|---|---|---|
| Re: | My Client/Claimant: | Michael D. McCoy |
|  | Policy Holder: | Insurance Risk Managers, Ltd. |
|  | Policy Number: | 83025950 |
|  | Administered by: | The Hartford |
|  | Underwritten by: | Continental Casualty Company |

Dear Ms. Macko:

This letter is a follow up to your letters of January 21, 2008, and January 24, 2008.

We were able to obtain the records relating to Mr. McCoy's hospitalization at Carle Foundation Hospital in January 2008.  In addition, we were able to obtain copies of medical records from Carle Clinic/Carle Foundation Hospital going back to May 1, 2007.  I have organized and categorized the records, and I enclose copies of the following documents relating to Mr. McCoy's medical care and treatment from May 1, 2007, through January 31, 2008:

1.      Letter from Dr. Donald Greeley dated January 24, 2008.  This letter confirms that Mr. McCoy has a paralyzed right diaphragm, and it also confirms that his diaphragm has been paralyzed since at least March 26, 2006.  Mr. McCoy clearly had this problem long before Hartford terminated his disability benefits on June 29, 2007.  In fact, in Paragraph 1 of Part I of the Claimant Questionnaire completed on May 1, 2006, Mr. McCoy noted how he quickly got tired with very little exertion.  Dr. Greeley's letter also confirms that "[t]his paralysis has been causing him major physical difficulties with shortness of breath and inability to do any significant exertional activities."

2.      Hospital reports relating to Mr. McCoy's January 2008 hospitalization.  In the discharge summary, the discharge diagnoses include chronic obstructive pulmonary disease exacerbation and right hemidiaphragm paralysis.

**EXHIBIT F**

Marsha L. Macko
February 4, 2008
Page Two

The discharge summary also reflects the following chronic medical problems: coronary artery disease, history of myocardial infarction, depressive disorder, gastroesophageal reflux disease, congestive heart failure, obstructive sleep apnea, periodic limb movement disorder, hyperlipidemia, pulmonary embolism, and bladder cancer.

At the bottom of page 2 of Dr. Greeley's consultation report dated January 6, 2008, Dr. Greeley notes that he went back and reviewed x-rays from March 26, 2006, to January 5, 2008. Again, he noted that Mr. McCoy had an elevated right diaphragm in all of those films.

On page 2 of his report of January 5, 2008, Dr. Whitehill mentions "diastolic dysfunction" in conjunction with the congestive heart failure diagnosis. On page 4 of his report, Dr. Whitehill also notes Mr. McCoy's uncontrolled hyperlipidemia and his chronic hypokalemia.

As I pointed out in my appeal letter of December 6, 2007, all of Mr. McCoy's physical problems must be considered in combination with his significant psychological problems and his chronic and severe pain.

3.      Various diagnostic reports between October 15, 2007, and January 8, 2008. The report dated January 7, 2008, confirms the diagnosis of right diaphragm paralysis.

4.      Various cardiology reports and test results. On the first page of Dr. Bodine's report of July 25, 2007, there is a finding of "'mild' diastolic dysfunction." In addition, all of the ECG results say "Abnormal ECG."

5.      Records relating to Mr. McCoy's treatment for his low back pain and left hip pain problems. As was the case with the paralyzed right diaphragm, these records reflect that Mr. McCoy's back and hip problems predate the termination of his disability on June 29, 2007. Diagnoses include chronic low back pain, lumbar spondylosis, SI joint dysfunction, and left greater trochanteric bursitis. Although there is mention of doing a MRI a couple of times, Mr. McCoy has not been able to have one yet. Before it will allow Mr. McCoy to have a MRI, Carle Clinic/Hospital has asked him to get records from all of the hospitals where he has been hospitalized over the years in order to determine what foreign matters are in his body. Mr. McCoy was in several Indiana hospitals 15 to 20 years ago, and he has not yet been able to obtain those records.

6.      Report dated July 30, 2007, from the Sleep Clinic in the Division of Pulmonology at Carle Clinic. This report reflects that the visit of July 30, 2007, was a follow up to an earlier visit on March 7, 2007, which again predates the termination of Mr. McCoy's disability benefits. The report discusses Mr. McCoy's use of a CPAP following the initial visit.

7.      Records from the Carle Convenient Care Department and from Mr. McCoy's family practice physician, Dr. Swearingen.

8.      Various lab reports, which include those relating to Mr. McCoy's hospitalization in January 2008. These lab reports document Mr. McCoy's problems with hypokalemia and hyperlipidemia.

Marsha L. Macko
February 4, 2008
Page Three


As per your letter of January 24, 2008, it is my understanding that the 45 day period for Hartford's final decision will begin to run upon your receipt of these documents.  We will look forward to receiving Hartford's final decision within that time frame.

Very truly yours,

RAWLES, O'BYRNE, STANKO, KEPLEY & JEFFERSON, P.C.

s/Glenn A. Stanko

Glenn A. Stanko

GAS/jrh
Enclosures
cc:  Michael D. McCoy

**E-FILED**
Thursday, 27 March, 2008  10:52:14 AM
Clerk, U.S. District Court, ILCD



March 18, 2008

*Issued via UPS 2 business day delivery*

**Glenn A. Stanko, Attorney at Law**
**Rawles, O'Byrne, Stanko, Kepley & Jefferson PC**
**501 West Church Street, PO Box 800**
**Champaign, IL  61824-0800**

Policy Holder:    Insurance Risk Managers, Ltd
Claimant:         Michael D. McCoy
Insured ID:       9001449368
Policy Number:    83025950
Administered by The Hartford
Underwritten by Continental Casualty Company

Dear Mr. Stanko:

Pursuant to your request for reconsideration of Long Term Disability (LTD) benefits under the above referenced policy on behalf of your client Michael McCoy, the claim was referred to Appeals for review.  We have independently and thoroughly reviewed all evidence that has been presented during the course of Mr. McCoy's claim and have determined that the Company's decision to deny LTD benefits after 06/30/07 was correct.  Allow us to explain further.

Please refer to the Company's letter dated 06/29/07 for the policy provisions on which the initial determination was based.  Appeal's has reviewed this information and we find it to be accurate and will not repeat it here in detail.  We have also considered all information contained within Mr. McCoy's LTD claim file, including your letters dated 07/12/07, 12/06/07 and 02/07/08 as well as the additional medical documentation which was submitted on appeal.

To summarize, Mr. McCoy began working for Insurance Risk Managers, Ltd 11/01/72.  On his last date worked of 02/07/94, his occupation was Insurance Broker.  Your client initially ceased working due to acute myocardial infarction with coronary artery disease and underwent a double coronary artery bypass graft.  LTD benefits were approved for the period of 05/06/94 through 06/30/07.

Mr. Stanko, please note that the presence of medical or psychiatric conditions or symptoms does not determine a disability.  After LTD benefits have been approved for 36 months, a disability is defined as an injury or sickness which continuously renders the Insured Employee unable to engage in any occupation that he is or becomes qualified to perform based on his education, training or experience.

When reviewing the information presented, we consider your client's self-reported symptoms and to what extent the clinical findings confirm the symptoms.  We also consider the impact the

**EXHIBIT G**

findings would have as far as Mr. McCoy's ability to function on a daily basis and how it would continuously prevent him from performing the requirements of any occupation.

At our request, the medical information contained within Mr. McCoy's claim file was submitted for review by three (3) Independent Medical Consultants with MES Solutions (MES). Dr. Michael A. Rater, Board Certified in Psychiatry, reviewed the case from a psychiatric standpoint and Dr. Gary Nudell, Board Certified in Internal Medicine and Dr. Paul Lafavore, Board Certified in Anesthesiology with a Sub Specialty Certificate in Pain Medicine performed the review from physical and pain medicine standpoint. A copy of Dr. Rater, Dr. Nudell and Dr. Lafavore's nineteen (19) page report has been enclosed with this letter for your reference.

Dr. Rater contacted Mr. McCoy's treating Psychiatrist and discussed the case on 02/22/08. Dr. James Whisenand indicated that Mr. McCoy had originally been disabled by his physical conditions but had gotten used to being on disability and had developed a significant dependence on opiate analgesics with a pre-existing rigid/poorly adaptive personality style. In Dr. Whisenand's opinion, these combined factors would make Mr. McCoy a very poor candidate for return to work. Dr. Whisenand also indicated that Mr. McCoy had anger management problems and did not believe he would be able to maintain emotional composure upon return to work. Dr. Whisenand added that Mr. McCoy occasionally made references to carelessness regarding his life and believed that suicidal thinking might increase upon an attempted return to work.

Dr. Rater spoke with treating Psychologist Dr. Sipich on 02/20/08. Dr. Sipich indicated that Mr. McCoy minimized his symptoms and tried to overdo his activities and used his outgoing personality to manage his symptoms of depression. Dr. Sipich had observed Mr. McCoy become enraged after a woman hit his car in the physician's parking lot and spoke of one occurrence where Mr. McCoy forgot his scheduled appointment. Dr. Sipich stated that Mr. McCoy enjoyed mowing people's lawns as a way of giving to others and maintained a few close friends. Dr. Sipich also stated that Mr. McCoy experienced chronic suicidal ideation which was assessed at every appointment.

Based on his discussions with the treating physicians and a review of the medical evidence and the surveillance video, Dr. Rater opines that Mr. McCoy did not have any psychiatric restrictions and limitations as of 06/30/07. When your client was first seen by Dr. Whisenand in 2006, he was diagnosed with dysthymia and personality problems. This is not a psychiatric profile which is consistent with work limitations or restrictions. Based on the information provided, Mr. McCoy has low grade depression which is managed with treatment. Mr. McCoy's psychiatric conditions were reportedly stable until October 2006 when he learned that his claim for LTD benefits was under review and that surveillance video had been obtained. At that time, he experienced increased depression with decreased ability to function. However, during the meeting with an investigator in late October 2006, Mr. McCoy showed no psychiatric conditions or limitations. He was personable, articulate and detailed.

Dr. Rater states that Mr. McCoy's personality and presumed opiate related factors do not provide evidence of a psychiatric condition that would limit or restrict his ability to work, but, speak to his character and pain management issues. Dr. Rater further opines that the information provided does

not support an inability to perform work activities from a psychiatric perspective after 06/30/07, stating that no evidence to the contrary was submitted.

With regards to Mr. McCoy's psychiatric conditions and symptoms, as well as his use of psychotropic medications, Dr. Rater states there is no evidence of cognitive functional impairment which would limit or restrict employment.

Dr. Nudell attempted to speak with treating Family Practitioner Dr. Jeffery Swearingen on 02/15/08. However, Dr. Swearingen's office indicated that he had nothing to say in addition to the information already provided in the records. Based on a review of the medical evidence provided and the surveillance video, Dr. Nudell opines that Mr. McCoy would be limited to light level work activities, which is exerting up to 20 pounds of force with frequent standing and walking, as long as he was able to rest as necessary due to complaints of shortness of breath. Dr. Nudell further opines that Mr. McCoy has exhibited the ability to perform at least sedentary full time work from a physical standpoint. Dr. Nudell states that while Mr. McCoy has symptoms of shortness of breath, partly attributed to an elevated hemidiaphragm, he was observed on surveillance video exerting himself beyond that which would be expected in a light duty job. In addition, Mr. McCoy's recent cardiology evaluations and his recent dobutamine stress test were essentially normal.

Dr. Nudell does not find a clear basis for Mr. McCoy's chronic severe pain complaints. The records do not contain objective imaging studies to corroborate severe complaints of pain and there are limited, if any, objective physical findings to substantiate the reported pain levels. There are no imaging studies documenting any significant spinal disorder. While Mr. McCoy complains of wrist pain due to a prior wrist fracture, there are no recent orthopedic evaluations. However, Dr. Nudell states that pain is very subjective and it would be possible to have subjective complaints of pain with limited objective findings. With regards to Mr. McCoy's cognitive function, Dr. Nudell states there is no documented evidence of a cognitive functional impairment or deficits due to the use of prescription medications.

Dr. Lafavore also attempted to contact Dr. Swearingen to discuss Mr. McCoy's case, however, Dr. Swearingen's office again indicated that he had nothing to say in addition to the information already provided in the records. Based on a review of the medical evidence and the surveillance video, Dr. Lafavore cannot determine an organic basis for Mr. McCoy's severe pain complaints and finds them to be disproportionate to the objective medical findings provided. Dr. Lafavore states there is no real objective evidence to account for your client's severe pain and the activity level Mr. McCoy demonstrates on surveillance is not consistent with a patient in severe pain. With regards to Mr. McCoy's long term use of narcotic and over the counter medications, Dr. Lafavore does not find any evidence of a cognitive functional impairment. Dr. Lafavore opines that Mr. McCoy had the physical ability as of 06/30/07 to sustain full time sedentary level work activities due to an absence of physical and cognitive impairment and based upon the abilities demonstrated on surveillance video and during the 10/25/06 interview.

Mr. Stanko, we acknowledge that Mr. McCoy has physical and psychiatric conditions and symptoms which may require ongoing treatment. However, the presence of a condition, symptom or treatment for such does not determine a disability. The medical findings provided to us do not

support that his physical or psychiatric conditions and symptoms were of such severity that he was rendered incapacitated and unable to perform work activities as of 06/30/07.

With regards to Mr. McCoy's physical functionality, as you are aware, on 10/25/06 Mr. McCoy underwent an interview at our request. The Interviewer stated that Mr. McCoy had noticeable muscle definition in his forearms. Mr. McCoy was very descriptive about this lawn mowing and wood working activities. Mr. McCoy showed the Interviewer his workshop which was organized with tools, cabinets, parts, wood projects and fishing gear. Mr. McCoy's lawn was nicely landscaped with shrubs and flowers and he described additional yard work that he would be doing. On surveillance, Mr. McCoy was observed, walking, standing, bending, lifting/carrying multiple items of varying sizes, driving and mowing grass with a push and a riding lawn mower. All of this information supports that despite the presence of Mr. McCoy's multiple physical conditions and reported symptoms, his physical functionality as of 06/30/07 was equal to or greater than the requirements of a sedentary level occupation. In your letter dated 02/07/08 you state that Mr. McCoy has a paralyzed right diaphragm which has been present since at least 03/26/06. However, the presence of this condition did not appear to limit Mr. McCoy's activities during the surveillance taken in September 2006. Mr. McCoy's physician Dr. Greeley states that this condition would cause "major physical difficulties with shortness of breath and inability to do any significant exertional activities", however, significant exertional activities are not a requirement of a sedentary level occupation.

With regards to Mr. McCoy's psychiatric condition and symptoms, his diagnosis of chronic depression is managed and controlled per Dr. Rater. Although Mr. McCoy experiences exacerbations in his condition and symptoms, the exacerbations are not permanent and resolve within a relatively short period of time based on the medical record.

Dr. Whisenand and Dr. Sipich indicate that Mr. McCoy expresses a carelessness regarding his own life and has chronic suicidal ideation. Yet there have been no known hospitalizations for suicidal ideation or suicide attempts or changes in the treatment plan due to the reported carelessness for his own life or chronic suicidal ideation.

During the previously aforementioned interview, Mr. McCoy indicated that he regularly becomes angry, describing these situations as "flashpoint anger" and states that he is not a nice person to be around. Mr. McCoy's former co-workers and his attending physicians describe episodic outbursts and issues with anger. Dr. Whisenand describes Mr. McCoy as having a rigid/poorly adaptive personality type. Dr. Rater indicates that these as character issues, and not psychiatric conditions for which restrictions and limitations would be supported. While Mr. McCoy may have a personality type which is quick to anger, this in of itself is not considered to be a disability.

In Mr. McCoy's affidavit of 12/05/07 he disputes that he has the transferable skills to perform the alternative sedentary level occupations which were provided in the Company's letter dated 06/29/07. Please be advised that these are samples of alternative sedentary level occupations and are not indicative of the only occupations that Mr. McCoy would be capable of performing based on the information provided.

Mr. Stanko, we acknowledge that Mr. McCoy has received LTD benefits for an extended period of time. However, this does not support a continuance of disability benefits in the absence of medical findings which objectively support an ongoing functional impairment.

We also acknowledge that Mr. McCoy was approved for and is receiving Social Security Disability Income (SSDI) benefits. While the favorable decision of the Social Security Administration (SSA) was considered during our review, the SSA has their own guidelines for determining a disability. We are not bound under the terms of the LTD policy to provide benefits based on an award by the SSA or the decision of any other entity.

We also note that Mr. McCoy was hospitalized from 01/05/08 to 01/08/08 due to an exacerbation of chronic obstructive pulmonary disease, pneumonia and right hemidiaphragm paralysis. During this period of inpatient confinement it is reasonably that Mr. McCoy was totally disabled. However, since a continuous period of disability was not supported from 06/30/07 to the date he was hospitalized, Mr. McCoy was no longer covered under the policy on 01/05/08. As such, no benefits can be approved for this loss.

In closing, based on the totality of the evidence provided, Appeals find the decision to deny LTD benefits after 06/30/07 to be proper and is upheld.

This will complete the appeals review.

All administrative remedies offered by the Appeals process have been exhausted. This decision is final and binding.

*You are entitled to receive, upon request and free of charge, reasonable access, to and copies of, all documents, records and other information relevant to your claim. You may bring a civil action under Section 502(a) of the Employee Retirement Income Security Act of 1974 (ERISA).*

If you have any questions, please feel free to contact our office at Toll Free (800) 741-4306, x6043. Our office hours are 8:00am to 8:00pm EST, Monday through Friday.

Sincerely,

*S/ Marsha L. Macko*

Marsha L. Macko, Appeal Specialist

Benefit Management Services
Maitland Claim Office
P.O. Box 946710
Maitland, FL 32794-6710
Fax (407) 919-6265